### DWIGHT F. FAULKNER *v.* SAMUEL HEBARD.

#### . *Contract.* *Consideration.*

A contract, for the sale of property, which is merely what is termed a refusal of the property by one of the parties; leaving it optional with the other party, whether he will take the property, within a certain time or not, unless upon some other consideration, or under seal, would not be valid in law, for want of consideration.

But where F. and H. entered into a written contract, by the terms of which H., in consideration of a certain number of shares of stock in the Vermont Central Railroad Co., " to be delivered, to me, (H.) by F. on or before the first day of July, 1850," agreed to sell and convey certain property to F., and this contract was signed by both parties—*Held*—that the contract was upon sufficient consideration; and that both parties are bound to do what is specified in the contract to be done on his part; and that if F. had declined to deliver the stock according to the terms of the contract, an action would lie upon the contract, for the refusal.

And in such a contract, the delivery of the stock, and the conveyance of the property are *concurrent acts;* and as the one promise is the entire consideration of the other, neither party would be bound, to absolutely convey his property; except upon the conveyance by the other.

But either party, claiming damages for non-fulfillment of the contract, must either show a readiness, and offer to perform on his part, or that he was excused therefrom by the consent or the conduct of the other party.

The directors of the Railroad Company, by letting in those who paid but $30, to an equal participation in the profits of the company, with those who paid $100, lessened the market value of the stock which F. by the contract sold to H.; *it was held*, that if this act of the directors was a legal one, then it was one which H. was bound to know they might do, and would therefore form one of the contingencies of H's. purchase; and whether the act of the directors was before or after the actual time of sale, would no more affect the validity of the sale, than

Faulkner *v.* Hebard.

any other legal act of theirs; but if the act was an unlawful exercise of author-
ity, by the directors, then H. when he became a stockholder might resist it in
any legal way; and therefore will form no defense for H. in a suit for a non-
performance of the contract.

ASSUMPSIT, on a special contract which will appear in the state-
ment of the case.

Plea, the general issue, and trial by jury.

On the trial the plaintiff offered in evidence, the contract de-
clared on, of which the following is a copy:

" In consideration of thirty-six shares in the Vermont Central
" Railroad Co. to be delivered to me by D. F. Faulkner on or be-
" fore the first day of July next, I do hereby agree to sell to the
" said D. F. Faulkner, my twelve shares in the East Bethel Fac-
" tory, together with all my interest in the old machinery, &c. be-
" longing to said mill.

" I also agree to sell D. F. Faulkner my brick dwelling house,
" formerly belonging to the Factory together with all the land,
" barns, &c. as formerly deeded to the Factory by Joseph Fowler,
" rent of the Factory to be paid to Mr. Hebard to April first.

" Possession of the dwelling house to be given to D. F. Faulk-
" ner on or before the first day of July next, and possession of
" the land to be given on the first day of April next.

" East Bethel, March 21, 1850.          D. F. FAULKNER.
              (Signed,)                SAMUEL HEBARD."

" Witness—SAMUEL H. HEBARD.

To the admission of the same, the defendant objected on the
ground of variance, and also on the ground that it was not mutual,
and furnished no evidence of consideration for the promise of de-
fendant.

The court overruled the objections and admitted the paper, to
which decision the defendant excepted.

The plaintiff also offered in evidence a letter from defendant,
of which the following is a copy:

                          " East Bethel, March 25, 1850.

" Mr. D. F. FAULKNER,

" DEAR SIR :—I am prepared to deed to you the Factory and
" also the house and premises, &c. You will set 15 shares to
" Enoch Hebard of Randolph, Orange County, and State of Ver-
" mont, and forward the certificate of said fifteen shares in the

" Vermont Central Railroad. Also the other twenty-one shares " in Vermont Central Railroad to me Samuel Hebard, of Bethel, " Windsor County, and State of Vermont, making t hirty-six " shares in the whole; you may send the certificate to Mr. Wedge- " wood, and we can exchange the writings agreeably to your or- " der and the contract.

Yours Respectfully,

(Signed,)          SAMUEL HEBARD."

This letter was post marked " E. Bethel, Vt.," and directed on the outside " Dwight F. Faulkner, Esq., Boston, Mass."

. The plaintiff also proved, that pursuant to the instructions therein contained, he obtained the certificate from the proper offi- cer in due form, of the transfer to Enoch Hebard, of fifteen shares of the Vermont Central Railroad Co., dated March 28, 1850, and also a similar certificate of the transfer to the defendant of twenty- one shares in said stock, which certificates the plaintiff sent to said Wedgewood, who was in the employ of the plaintiff at Bethel, to deliver to defendant, and secure a conveyance from defendant to the plaintiff of the property named in said writing above recited; and said Wedgewood requested the defendant to make said con- veyance and receive said certificates, which the defendant declined doing; for the reason, that before the said contract was made and said writing executed, the said railroad stock, by the action of said company by its officers, had been reduced in value from ten to twenty dollars on each share, and which, at the time of signing said contract was unknown to the defendant.

The defendant offered evidence tending to prove, that he then offered to convey back the said stock to the plaintiff. Also evi- dence tending to prove, that the value of the property named in said writing, agreed to be conveyed by defendant to the plaintiff, was worth some $1,720,00, to wit, the dwelling house and prem- ises $1,000, and the factory shares $720.

That on the day of the making of said agreement and writing, (which was about five o'clock, P. M. March 21, 1850,) the direc- tors, of said Railroad Co., at a legal meeting in Boston, holden in the forenoon of that day, ordered the issuing of fifty thousand shares of new stock in said company, at thirty dollars per share, which at once reduced the value of all the stock in said company to below the sum of thirty dollars per share. That at the time of

said trade, the plaintiff assured the defendant that the stock in said company was worth over fifty dollars per share, although it had been selling for less.

It appeared in evidence, that up to that time said stock had been selling in market at from forty to fifty dollars per share ; that the defendant had never been a stockholder in said company.

The defendant also offered evidence tending to prove, that at the time of said trade, and up to the '26 or 27th day of March, 1850, he was entirely ignorant, and had no suspicions that the said company, or its officers had done or contemplated issuing new stock at reduced prices, or doing any thing the effect of which would be to depreciate the value of said stock; but supposed that said stock was then worth from forty to fifty dollars per share, and that it would have been worth said sum had it not been for the issue of said new stock.

That said contract was made at Bethel ; and that the plaintiff then, and for a long time before resided in said Boston. There was no evidence to show, that at the time of making said contract the plaintiff knew that the company had reduced the value of the shares, by issuing the new stock nor was there any evidence tending to prove, that plaintiff knew that said company, or their officers contemplated such a thing.

The court,—PIERPOINT, J., presiding,—decided that said writing was a valid, mutual contract between the parties, and furnished a sufficient consideration for the undertaking on the part of the defendant.

And that unless the plaintiff knew at the time of said trade, that said stock was reduced in value by the action, or contemplated action of said directors, and represented in relation thereto what he knew to be false, which would amount to actual fraud on his part, the plaintiff must recover.

The court also decided, that the plaintiff having transferred the railroad stock, so that the title vested in the defendant, the damages which plaintiff was entitled to recover, if any, was the value of the real estate and the manufacturing stock agreed to be conveyed, by the defendant to the plaintiff, and interest from July 1, 1850.

Thereupon the defendant consented that a verdict be taken for the plaintiff, with leave to except to the ruling of the court in the

matters aforesaid, and that the court assess the damages, all which was agreed to, and a verdict was accordingly taken for plaintiff, and the court assessed the damages according to their decision.

To the several decisions of the court, the defendant excepted.

*Converse & Barrett* for defendant.

I. The paper writing was improperly received in evidence, because it does not support the declaration.

II. The contract is not *mutual*. There was no agreement on the part of the plaintiff to convey the 36 shares. The agreement was all on one side. Plaintiff could perform or not as suited his interest, and the defendant could have no remedy on the contract if he neglected to procure the *stock*.

III. If, however, there was a binding agreement on the part of plaintiff, it furnished the consideration only for the sale and transfer of the twelve shares of defendant in the factory, and the old "machinery in the mill." The house and barn was an independent stipulation, not based upon the consideration of the thirty-six shares of railroad stock, and so *clearly* there is no consideration for this agreement on the part of defendant.

IV. Under the proof the plaintiff was not entitled to recover; it was at least, a mutual mistake, or ignorance relative to a fact very seriously affecting the value of the stock, and which justified the defendant in repudiating the contract. *Ketchum* v. *Catlin*, 21 Vt. 196. *Gilman* v. *Pike*, 2 Vt. 576.

No laches can be imputed to the defendant. He made his election as soon as the fact came to his knowledge, and upon being requested by Wedgewood, the plaintiff's agent, to carry into effect the contract. *Wainright* v. *Webster*, 2 Saund. Pl. 674. 9 M. & W. 53.

The letter of the defendant to the plaintiff, was written before defendant had any knowledge of the reduction of the value of the stock. The depreciation of the stock, by the action of the directors had taken place before the contract was made; the latter being done at five o'clock, P. M., and the former on the forenoon of the same day.

It cannot be pretended that the defendant would have entered into the contract had he known the facts. Nor could he be charged with neglect or want of attention in making proper inquiry about

them. Thus defendant is brought within the principle of the decided cases above cited.

*A. P. Hunton* for plaintiff.

I. The title to the railroad stock did not vest in the defendant, because he did not accept or receive the certificates. And as to fifteen of them, for the further reason that the certificate was made in the name of Enoch Hebard. The title of these did not pass to him, because he was not a party to the contract and did not accept the certificate.

If the defendant had accepted the certificates or offered to receive them, and refused to convey the property, it would not have vested the shares in him.

But if the legal title did vest in the defendant, or the defendant and E. Hebard, they hold the same merely as trustees for the plaintiff; hence no beneficial interest in them, and are bound to reconvey on demand.

And the fact that they have the strict legal title, if it exists, should not be taken into the account in estimating the damages.

II. The contract is properly described in the declaration. It was made on good consideration. And there was no fraud on the part of the plaintiff.

The opinion of the court was delivered by

REDFIELD, Ch. J. I. We have spent no time upon the question of variances between the declaration, and the contract, since the defendant's counsel admit, that one of the counts in the declaration is unobjectionable on that ground, and more perhaps, if the contract is construed to contain mutual promises, which is the next point made. If one count is good in this respect it is sufficient.

II. We think the contract is something more than what is termed a mere refusal of the property by defendant, leaving it optional with plaintiff, whether he will take the property, within a certain time or not. Such a contract, unless upon some other consideration, or under seal, would probably not be regarded, as valid, in law, for want of consideration. But it was intended, by the parties to this contract, as appears by its very terms, to have it upon consideration. And it seems to us, that the contract, in terms, con-

XXVI 30

tains a stipulation, on the part of the plaintiff, to deliver the stock, by the first of July, 1850. And that if he had declined doing so, an action would lie upon the contract, for the refusal to do so. The terms are, " to be delivered, to me, by D. F. Faulkner on or before the first day of July next," and this is signed by both parties. We think the intention of the parties was, that both parties should be bound to do what is specified in the contract to be done on his part.

III. But, by the terms of the contract, as it seems to us, the delivery of the stock, and the conveyance of the property, stipulated to be conveyed, on the part of the defendant, were to be *concurrent acts*. And although the plaintiff by the terms of the contract, was first to move in the premises, so far as to manifest a readiness to convey, we do not deem it reasonable, inasmuch as the one promise is the entire consideration of the other, to hold, that either party was bound to absolutely convey his property, except upon the conveyances, by the other. The import of the contract is, that each shall convey to the other, at the same time, but the plaintiff has the privilege of naming any time, before the first day of July next, and if he do not, it shall be done upon that day. In regard to this class of contracts, it is a settled rule, that neither is obliged to convey absolutely, if the other declines conveying, on his part. The other party is then restricted to his remedy in damages. But the party claiming damages must either show a readiness, and offer to perform on his part, or else that he was excused therefrom, by the consent or conduct of the other party. We conclude, therefore, that the plaintiff was not bound absolutely to part with his property, except upon the receipt of a conveyance from defendant. Such a rule of construction would make the contract unequal and unjust and we ought not to give the contract such a construction, unless its terms so clearly speak, which is not the case.

The plaintiff then, as it seems to us, was not bound to part with the title of his stock unless he obtained the stipulated pay. It was not a case of credit, or independent promise on either part. And the proof does not show any consent by plaintiff to part with the title of the stock, or of the defendant *to* receive it. Wedgewood, the person to whom the certificates were sent, was at most a mere stakeholder, or agent for both parties, but strictly he was the plain-

tiff's agent, and evidently so viewed by both parties; and therefore although the stock was on the company books transferred to the names of defendant and his agent, still there was no such actual delivery to defendant, as would vest any legal property in him in his own right. The most that could be claimed would be that the plaintiff having done this, by defendant's direction, might, at his election, treat the title of the stock, as having passed to defendant. But I think this even will not follow, from what was done. The plaintiff then was entitled to recover, if at all, the difference between the value of the stock at the time, and the property stipulated to be conveyed by defendant, and the judgment must at all events be reversed for this cause.

IV. But the important question in this case is, whether the plaintiff can recover at all. The finding of the jury negatives all fraud or intentional misrepresentation, on the part of the plaintiff, or even knowledge of the circumstance, which it is claimed should exonorate the defendant from his contract. The only question, then is, whether the parties were under such a mutual misapprehension, in regard to the actual state of the subject matter of the contract, at the time of entering into it, as will relieve the defendant from the obligation of it. This is a familiar ground of relief from the performance of contracts in a court of equity, and as a general thing confined mainly to that forum. But in some few cases it has been allowed, as a defense, at law. The case of *Ketchum* v. *Catlin*, 21 Vt. 191, has perhaps gone to the full extent of such relief, in a court of law, and may be regarded as laying down the law, as it now stands, in regard to defense at law to contracts, on the ground of mutual misunderstanding in regard to the state of the subject matter at the time. And this case goes upon the ground, that to constitute a defense at law such subject matter must be so changed, at the time of the contract, without the knowledge of either party, as not in any sense to answer the purpose, for which the contract was made. This mode of defense goes upon the ground, that if the party buys one thing, or a thing, in one state, he is not bound to accept of a different thing, or the same thing, in a different state. If property is sold, as being in existence and in fact has been destroyed, or changed state, the sale will be inoperative.

But any accidental occurrence, not directly affecting the state

or quality of the thing sold, but only its market value, will have no such effect. News of peace or war, or commercial restrictions, or the repeal of such restrictions, or their modification, has often a most surprising effect upon the market value of commodities, but whether both parties, or one only, is ignorant of such facts, which renders the matter more unjust and unequal, is no ground of relief even in equity, unless the one party gaining the advantage, is guilty of artifice, or misrepresentation. The rule of the civil law was somewhat different and more in accordance with the rule of moral justice and equity, than that of common law. This has been with some writers a ground of reproach to the common law, as being less in accordance, with the principle of christian morality, than the law of pagan Greece and Rome. But the case put in *Cicero de officiis* is of this character, where the two cargoes of corn coming into Rhodes, in time of famine, or great want, and the one first reaching port, knowing of the near approach of the other, with a large supply, the question is whether the first is bound, before he sells his cargo, to make known the probable early arrival of the other? The Roman casuist decides that he is, and so must a christian moralist; but the common law will not allow any such determination, in a civil tribunal!

So too, stocks may be affected, by general legislation, by the granting of other charters, by governmental negociations, by war, or peace, by the management of the corporations, by the result of an election, by the death of an important financial agent, and by a thousand other accidental matters. The question is, whether such mere accidents, not affecting the inherent quality of the stocks or essentially their actual value, can be said to create such a change of state, as to justify the vendee in refusing to go forward with his contract. I have not been able to find any such case, and the books are filled with those of an opposite character.

Had this vote of the directors cancelled, or annihilated the stock, it would no doubt have been a good ground of defense to this action, within the principle of the best considered cases upon the subject. But so far from that, it did not affect the stock in any sense, except incidentally, by its increase at a low rate. This had three accidental effects upon all the stock of the company. 1st. It showed the company to be embarrassed, if not desperate, which of itself had a tendency to lessen the market value of the stock,

Faulkner *v.* Hebard.

but not its real value. 2d. It showed the probable opinion of the directors . that the stock was not worth much above $30, which would have a similar effect. 3d. If it was a legal act it did tend to lessen in some degree the actual value of the stock, by letting in those who paid but $30, to an equal participation in the profits of the company, with those who paid $100. But if this was a legal act it was one, which the defendant was bound to know the directors might do, and which would therefore form one of the contingencies of his purchase, and which, whether. done before or after the actual time of sale, could no more affect the validity of the sale, than any other legal act of the directors. If the act was an unlawful exercise of authority, by the directors, the defendant when he became a stockholder might resist it, in any legal way.

The length of time given the plaintiff to deliver the stock must have involved the hazard of the directors doing many things, which might affect the stock, and indeed, every legal act certainly, and illegal acts would not bind the stockholders. We do not see how this will form any defense to the suit, there being no fraud or misrepresentation.

Judgment reversed, and case remanded.