31 736
55 55

31 736
56 173

31 736
d61 47
61 481

31 736
63 162

# CHARLESTON.

## WEAVER *v.* BURR.

Submitted June 25, 1888.—Decided December 15, 1888.

1. SPECIFIC PERFORMANCE—OPTION.—

J. B. executed and delivered to the plaintiffs' agent the following instrument in writing: "I am willing to sell my land on which I now reside, in the county of Pocahontas and State of West Va., containing five hundred (500) acres, more or less for the price of six dollars and twenty-five cents per acre, ($6.25,) cash; and the parties for whom F. P. Huxthal is negotiating for said land shall have the privilege of buying said property at said price, and on said terms, for sixty days from this, the seventh day of June, 1883.—JOHN BURR." In the month of July following the plaintiffs' agent Hanson Reading called upon and told J. B. that the plaintiffs would take said property at the price agreed upon. Not later than the 15th of July, 1883, another agent of the plaintiffs, Alexander F. Mathews, communicated to J. B. by mail that the plaintiffs had elected and determined to take the tract of land mentioned in said writing at the price and upon the terms therein mentioned, and that they were prepared to pay for said land according to said terms, so soon as he should convey the same to them by proper deed. J. B. never executed to the plaintiffs any deed for said land, and, in consequence of his failure to execute such deed, the plaintiffs never paid or tendered to him any part of the price of said land. Upon suit brought by the plaintiffs against the heirs of J. B., to enforce the specific performance of the alleged contract for sale of this land, *held;* Said proposal of J. B. to sell to the plaintiffs the 500 acres of land described therein did not of itself constitute a valid contract with the plaintiffs for the sale of said land within the time, at the price and upon the terms therein mentioned. (p. 742 *et seq.)*

2. SPECIFIC PERFORMANCE—OPTION.

To convert such proposal to sell into a valid contract of sale it is essential, that the acceptance thereof be unconditional, and that notice of such acceptance be communicated to J. B. within the time limited, or that within that time some act be done by the plaintiffs, which he has expressly or impliedly agreed to treat as notice of such acceptance. (p. 744.)

3. SPECIFIC PERFORMANCE—OPTION.

If to the acceptance of such proposal a condition be affixed by the party, to whom the offer is made, or any modification or

change in the offer be made or requested, this will in law constitute a rejection of the offer. (p. 744.)

4. SPECIFIC PERFORMANCE—OPTION—BURDEN OF PROOF.

The burden of proof, that the proposal has been accepted, and that notice thereof within the time limited has been communicated to the proposer, rests upon the party claiming to have accepted the same. (p. 760.)

5. SPECIFIC PERFORMANCE—OPTION—NOTICE—TENDER.

Before said proposal of J. B. could be converted into a valid. and binding contract for the sale of said land, it was necessary— *first*, that the plaintiffs should have unconditionally accepted the same within sixty days from the 7th of June, 1883; *second*, that within that period notice of such acceptance should have been communicated to him; and, *third*, that the plaintiffs, before the expiration of said sixty days, should have complied with the terms thereof, by paying or tendering to J. B., in cash, the whole price of the land, at $6.25 per acre. (p. 773.)

6. SPECIFIC PERFORMANCE—OPTION.

Neither the acceptance of the plaintiffs communicated to J. B. by their agent Reading nor their acceptance communicated to him by their agent Matthews was sufficient in law to convert said proposal of J. B. into a valid and binding contract for the sale to them of said land. (p. 770.)

Statement of the case by WOODS, JUDGE:

This is a suit in chancery brought on the 31st January, 1884, in the Circuit Court of Kanawha county, by John F. Weaver and W. W. Betts, partners composing the firm of Weaver & Betts, and William Reading and R. C. Reading, composing the firm of Emery & Reading and Franklin Reading, plaintiffs, against Levi Gay, administrator of John Burr, deceased, Catherine Burr, his widow, and Charles W. Burr, Mary E. Smith, John Smith, Rebecca Dean, Isaac P. Dean, Alvin Burr, Henry S. Burr, Sarah A. Buzzard, Jackson Buzzard, Fanny B. Burr, Ida J. Burr, and Lillie V. Burr, for the specific performance of the following agreement, made by John Burr in his lifetime:

"I am willing to sell my land on which I now reside, in the county of Pocahontas and State of West Virginia, containing five hundred acres, more or less, for the price of six dollars and twenty-five cents per acre cash; and the parties for whom Mr. F. P. Huxthal are negotiating for said land shall have the privilege of buying said property at said

93

price, and on said terms, for sixty days from the seventh day of June, 1883.—John Burr."

The bill alleges the execution of said writing, and filed the same as part thereof, as "Exhibit A; " that in consideration and upon the faith of said agreement the plaintiffs at once went on, and at some trouble and expense had the land examined, and a survey thereof made, its metes and bounds run and established, by which the exact quantity in said tract was ascertained to be 467½ acres; that, and within said sixty days, " and long before that period had expired, they notified the said Burr in writing that they had determined and elected to buy, and would take the said land at the said price, and upon the said terms; and that they were prepared, and ready and willing, and then offered, to pay for it so soon as he would execute and have ready to deliver them a deed therefor; that at the same time they placed the amount of the purchase-money for said land in the hands of their attorney, " ready to be paid over as above stated," and he has been ever since prepared, ready, and willing to pay the same for said land so soon as a proper and sufficient deed was executed.

The bill further avers that the plaintiffs, to save said Burr trouble and expense, had such a deed prepared and sent as he had directed to be executed and held ready for delivery to them, but said Burr neglected and failed in his lifetime to have said deed executed, and in consequence the purchase-money has never been paid him; that said John Burr on the — day of —, 1883, suddenly died intestate, leaving surviving him his said widow and the defendants, Charles W. Burr, Mary E. Smith, Rebecca Dean, Isaac P. Dean, Alvin Burr, Henry S. Burr, Sarah A. Buzzard, Fanny B. Burr, Ida I. Burr and Lillie V. Burr, his children, and heirs, the last three of whom are infants, and that defendant, Levy Gay, was duly appointed his administrator.

The bill further alleges, that the plaintiffs, ever since they elected and determined to buy and take said land, have been ready and willing and are still ready and willing and here now offer to pay the said purchase-price in full as aforesaid, as soon as and whenever they can get a suitable conveyance therefor by apt and proper deed to the person or persons entitled thereto.

The bill further avers that the principal value of the land consisted in. the timber thereon, which the defendants, Charles W., Alvin and Henry S. Burr, were engaged in cutting, wasting, and destroying; and thereupon prayed for a preliminary injunction to stay waste, and that said heirs may be compelled to convey to the plaintiffs the said land upon the payment by them of said purchase-money, less such costs and expenses in this suit, and for general relief. This bill is verified by the affidavit of the plaintiffs' counsel.

The judge of said court in vacation awarded the preliminary injunction prayed for, which was made effectual by the execution of the bond required. The infant defendants answered by their guardian *ad litem*, and the defendants, Charles W. Burr, Alvin Burr, Henry S. Burr, John Smith, and Mary E. Smith filed their joint answer to the plaintiffs' bill, duly verified, to which the plaintiffs replied generally.

By their joint answer the defendants deny that said John Burr ever made or entered into a legal and binding contract with the plaintiffs, or F. P. Huxthal, as their agent, for the sale of 467½ acres of land, as mentioned in the bill. They deny that the paper writing filed as "Exhibit A," with the bill, even if signed by John Burr, is such a contract for the sale of said 500 acres of land as could have been specifically enforced against him, or as can be enforced against the heirs of John Burr. They deny that said writing contains any agreement on the part of John Burr to sell the land to the plaintiffs, and they aver that it is a simple option, the conditions of which to give it validity, had to be strictly complied with, which the plaintiffs never in any manner did. They deny that the plaintiffs, or F. P. Huxthal, or any one for them, ever offered to buy, or gave notice to said John Burr within sixty days from the 7th of June, 1883, that they had determined and elected to and would buy and take, said 500 acre tract of land, at $6.25 per acre, or that the plaintiffs were in any sense parties to said paper writing, or that they can call upon these respondents or other heirs of John Burr to convey the said 500 acres of land to them, and compel them to accept therefor the price of $6.25 per acre. They deny that there was any consideration expressed in said

writing even if executed by John Burr, or that any survey of said land was ever made with his knowledge or consent, or that the same was fairly made, or that said tract of land contained less than 500 acres, or that any expense incurred in making such unauthorized survey can be made a consideration for said option, binding said Burr to convey to them said land; and they aver that said tract is one half of a tract of 1,000 acres, conveyed by Jacob Arbogast, commissioner, to William Kellison, and by said Kellison conveyed to John Burr by deed dated October 1, 1854, and recorded in Pocahontas county, in deed book 8, p. 308; and they file with their answer, as part thereof, a certified copy of said last-named deed. This deed describes the land so conveyed by said Kellison to Burr as follows:

"Whereas, pursuant to an order of the superior court of law and chancery, made at the May term, 1840, that Jacob H. Arbogast, commissioner, did on the 4th day of August, 1840, proceed to sell at public sale the delinquent and forfeited lands; at which sale Wm. Kellison, being the highest bidder therefor, became the purchaser of a lot of land which is known as lot ' No. 2' in the plat and report of the surveyor filed in the clerk's office of said county with the report of said commissioner respecting said sale, containing 1,000 acres, being part of a tract containing 12,851½ acres, patented to Robert MacClannahan on the 16th day of February, 1796. The one half or 500 acres of said land conveyed is bounded as follows: Beginning at B, four white pines, on both sides of a branch, corner to lot No. 3; and with it N. 70 degrees W. 400 poles to a white oak, dogwood and gum, on both sides of a branch, corner to lot No. 11; and with it S. 20 degrees W. 200 poles to two white oaks on the south side of Round Knob, S. 70 degrees E. 400 poles to two white oaks; and with the same N. 20 E. 200 poles to the beginning."

They deny that John Burr ever directed the plaintiffs to prepare and send to him a deed to be executed by him or that the plaintiffs in fact did prepare and send to him such a deed.

Depositions were taken on both sides, and on the 21st day of October, 1885, the cause was heard before Charles P.

Jones, who had theretofore been agreed upon to try the same, who entered therein the following decree:

" This cause came on this the 21st day of October, 1885, to be again heard before Charles P. Jones, special judge, who has been heretofore agreed upon to try the same upon plaintiffs' bill and exhibits filed therewith, the answers of Charles W. Burr, Mary E. Smith, John Smith, Alvin Burr, Henry S. Burr, Levi Gay, late sheriff of Pocahontas county, and as such administrator of John Burr, deceased, F. J. Snyder, guardian *ad litem* for Fanny B., Ida J. and Lilly V. Burr, general replication to said answers, exhibits filed with said answers, the demurrer to said bill, joinder therein,—and was argued by counsel.   Upon consideration whereof said demurrer is overruled, and, the court being of opinion that the plaintiffs are entitled to have a specific execution of the contract made and signed by John Burr on the 7th day of June, 1883, for the 467½ acres of land as surveyed by Uriah Byrd, therefore it is adjudged, ordered and decreed that upon the execution of good and sufficient deed by the adult defendants, heirs of said Burr, within sixty days from this date, and upon their failure to make and acknowledge such a deed, then R. S. Turk, who is hereby appointed a special commis· sioner for that purpose shall make and acknowledge a deed, with special warranty of title, conveying to the plaintiffs all the right, title and interest in and to said 467½ acres of land of the heirs of said John Burr ; and upon payment by the said plaintiffs to Levi Gay, administrator of John Burr as aforesaid, the sum of $2,921.87½, being $6.25 per acre for said land, subject to the costs of this suit, said commissioner shall then deliver said deed to said plaintiffs for recordation, for which they shall pay him a fee of five dollars.   The court, not deeming it necessary, doth not at this time pass upon the title to the 32½ acres in the answers mentioned ; and, in the event the widow of John Burr shall decline to convey her dower interest in said land, then George Baxster, S. W. Beard, and William L. MacNeal, who are hereby appointed for the purpose, shall go upon the land mentioned, and lay off and assign to the widow, Catherine Burr, a one third portion of the land, having regard to quantity and value, as and for her dower in said land, the cost of which shall be

paid out of the fund, and report their proceedings to court."

From this decree the defendant, Alvin Burr, has been allowed an appeal and *supersedeas*. The appellant assigns three grounds of error: *First*, in overruling the defendant's demurrer to the bill; *second*, in sustaining the claim of the plaintiffs to enforce the specific performance of said option against the widow and heirs of John Burr; *third*, in decreeing the specific performance of a part of said option, to-wit, to the extent of 476½ acres, before inquiring into the title to the whole of said 500 acres described in said option.

*B. L. Butcher* and *Geo. E. Boyd, Jr.*, for appellant.

*Alex. F. Matthews* and *R. S. Turk* for appellees.

WOODS, JUDGE:

The following questions, arising on the face of this record, are presented for our consideration: *First*, is the paper writing filed with the bill as " Exhibit A " a contract, binding John Burr to convey to the plaintiffs the land therein mentioned, at the price of $6.25 per acre? *Second*, can it be converted into such a contract by being accepted by the plaintiffs within 60 days from the 7th day of June, 1883? *Third*, could it become a valid and binding contract by the plaintiffs' accepting the same without giving John Burr notice of that fact? *Fourth*, was this option ever accepted by the plaintiffs within the time, at the price, and upon the terms specified therein? *Fifth*, and, if the said option was so accepted, were the terms thereof complied with by the plaintiffs within 60 days from the 7th of June, 1883?

If this option became a valid and binding contract by an unconditional acceptance of the terms thereof by the plaintiffs, and the terms thereof were complied with within the said period of sixty days, then it must be conceded that the plaintiffs are entitled to the relief prayed for; otherwise their bill should have been dismissed.

Whatever contrariety of judicial opinion may have heretofore existed in regard to such agreements or offers to sell land or other property, giving to the prospective purchaser a limited time within which he may purchase upon the terms prescribed, it is now well settled, that where the promise on

the part of the proposer to continue the offer for a specified time is made without consideration, it is *nudum pactum*, and may be withdrawn at any time, provided such retraction be communicated to the other party before he has accepted the same; for, until the proposal is accepted, there can be no contract, as there is nothing by which the proposer can be bound, and, unless both are bound so that an action could be maintained against the other for a breach, neither will be bound.

Mr. Bishop, in his work on Contracts, says : " This proposition is absolutely axiomatic, not admitting of being overthrown by authorities, so long as the law requires something of value as consideration.    *    *    *    If there be any cases in seeming contradiction to this, they are not to be followed; and a contract by mutual promises between an adult and a minor is binding on the adult, because the promise of a minor is not void, but is only voidable, and his right to recede from his promise is a personal privilege." Bish. Cont. §§ 77–79; 1 Benj. Sales, § 41; 1 Story Cont. § 495; Story, Sales, § 125; 1 Pars. Cont. 482; 1 Chit. Cont. 16–21; 1 Whart. Cont. § 10; *Cooke* v. *Oxley*, 3 Term R. 654; *Potts* v. *Whitehead*, 20 N. J. Eq. 59; *Tucker* v. *Woods*, 12 Johns. 190; *Wallace* v. *Townsend*, 43 Ohio St. 537, (3 N. E. Rep. 601 ); *Longworth* v. *Mitchell*, 26 Ohio St. 334; *Railroad Co.* v. *Dane*, 43 N. Y. 240; *Jones* v. *Noble*, 3 Bush 694; *Railroad Co.* v. *Bartlett*, 3 Cush. 225; *Dickinson* v. *Dodds*, L. R. 2 Ch. Div. 463; *Bean* v. *Burbank*, 16 Me. 458; *Gillespie* v. *Edmondston*, 11 Humph. 553; *Beckwith* v. *Cheever*, 1 Fost. (N. H.) 41; *Eskridge* v. *Glover*, 5 Stew. & P. 264; 1 Sugd. Vend. (8th Amer. Ed.) 195, 196.

Mr. Bishop in the same work (section 325) says: " Since an offer is not a contract, the party making it may withdraw it any time before acceptance.    Even though it is in writing, and by its terms is to stand open for a specified period, the result is the same.    With no money consideration, and no corresponding promise from the person to whom it is made, the promise not to withdraw it has no binding force.    If a consideration for the undertaking to leave the offer open is given and accepted, this of itself constitutes a contract, and the offer cannot be withdrawn." See, also, *Weiden* v. *Woodruff*, 38 Mich. 130 ; *Burton* v. *Shotwell*, 13 Bush 271; *Tucker*

v. *Lawrence*, 56 Vt. 467; *Quick* v. *Wheeler*, 78 N. Y. 300, 304; *Cherry* v. *Smith*, 3 Humph. 19; *Routledge* v. *Grant*, 3 Car. & P. 267; *Cheney* v. *Cook*, 7 Wis. 413; 1 Add. Cont. §§ 20, 21.

Wharton on Contracts, § 10, lays down the rule as follows: "Before acceptance, a proposal is 'but an offer to contract, and the parties making the offer might undoubtedly withdraw it at any time before acceptance.' The right to revoke before acceptance is one which prior conditions cannot limit. Thus, at an auction sale, the bidder may at any time recall his bid before the hammer falls, though the conditions of sale are that no bidding shall be retracted, and the seller may retract, though the sale was to be without reserve. It would be a *petitio principii* to say that the party retracting was bound by contract not to retract, since it is to this very contract not to retract that his retracting applies." *Railroad Co.* v. *Bartlett*, 3 Cush. 225; *Warlow* v. *Harrison*, 1 El. & El. 295; *Harris* v. *Nickerson*, L. R. 8 Q. B. 286; 1 Benj. Sales, § 41.

In order to convert such a proposal into a contract, it must be accepted by the other party, and the assent of the parties to the terms thereof must be mutual, and intended to bind both sides, and must co-exist in the minds of both parties at the same moment of time. The acceptance must be unconditional, and as broad and comprehensive as the proposal itself, and must include all of its terms and conditions without modification or change. If to the acceptance a condition be affixed, or any modification or change in the offer be requested by the party to whom the offer is made, this, in law, constitutes a rejection of the offer. 1 Benj. Sales, § 39; 1 Pars. Cont. 475, 476; 1 Chit. Cont. 15, 16; 1 Story Cont. § 502; *Insurance Co.* v. *Carrington*, 3 Conn. 357; *Hamilton* v. *Insurance Co.*, 5 Pa. St. 339; *Railroad Co.* v. *Bartlett*, 3 Cush. 225; *Eliason* v. *Henshaw*, 4 Wheat. 225.

The following adjudicated cases will serve to illustrate the manner in which the principles herein laid down have been applied:

*Railroad Co.* v. *Bartlett*, 3 Cush. 225, was a bill in equity to enforce the specific performance of a contract in writing· The bill alleged that the defendants on the 1st of April, 1844,

being the owners of certain land situated in Boston, and particularly described in the bill, " in consideration that said corporation would take into·consideration the expediency of buying said land for their use as a corporation, signed a certain writing dated April 1, 1844," whereby they agreed to convey to the plaintiffs "the said lot of land for the sum of $20,000, if the said corporation would take the same within thirty days from that date;" that afterwards, and within the thirty days, the defendants, at the request of the plaintiffs and in consideration that the said corporation agreed to keep in consideration the expediency of taking said land, *etc.*, extended the said time of thirty days by a writing underneath the written contract above mentioned, for thirty days from the expiration thereof; that on the 29th of May, 1844, while the extended contract was in full force, and unrescinded, the plaintiffs elected to take the land on the terms specified in the contract, and notified the defendants of their election, and offered to pay them the agreed price (producing the same in money) for a conveyance of the land, and requested the defendants to execute a conveyance thereof, which the plaintiffs tendered to them for that purpose ; and that the defendants refused to execute such conveyance, or to perform the contract, and had ever since neglected and refused to perform the same. To this bill the defendants demurred generally. On behalf of defendants it was contended that there was no allegation in the bill of a consideration for the contract as originally made, or as extended, and consequently it was not enforceable either at law or in equity. Fletcher, J., delivering the opinion of the court in this case, said :

" Though the writing signed by the defendants was but an offer, and an offer which might be revoked, yet, while it remained in force and unrevoked, it was a continuing offer during the time limited for acceptance; and during the whole of that time it was an offer every instant, but as soon as it was accepted it ceased to be an offer merely, and then ripened into a contract. The counsel for the defendants is most surely in the right in saying that the writing, when made, was without consideration, and did not, therefore, form a contract, and the parties making the offer most undoubtedly might have withdrawn it at any time before its accept-

ance. But when the offer was accepted the minds of the parties met, and the contract was complete." The demurrer was overruled, and the court held that "a proposition in writing to sell land at a certain price, if taken within thirty days, is a continuing offer, which may be retracted at any time; but if, not being retracted, it is accepted within the time, such offer and acceptance constitute a valid contract, the specific performance of which may be enforced by a bill in equity."

*Dickinson* v. *Dodds*, L. R. 2 Ch. Div. 463, was a bill in equity by Dickinson to enforce the specific performance of the following memorandum in writing: "I hereby agree to sell to Mr. George Dickinson the whole of the dwelling-houses, garden-ground, stabling, and out-buildings thereto belonging, situate at Croft, belonging to me, for the sum of £800. As witness my hand this 10th day of June, 1874. £800. [Signed] J. DODDS. P. S.—This offer to be left over until Friday, 9 o'clock, A. M. J. D. (the twelfth) 12 June, 1874. [Signed] JOHN DODDS."

The bill alleged that Dodds understood and intended that the plaintiff should have until Friday, 9 A. M., within which to determine whether he would or would not purchase, and that he should absolutely have until that time the refusal of the property at the price of 800 pounds, and that the plaintiff in fact determined to accept the offer on the morning of Thursday, the 11th of June, but did not at once signify his acceptance to Dodds, believing that he had the power to accept it until 9 A. M. on Friday; that in the afternoon of Thursday the plaintiff was informed that Dodds had been offering to sell the property to the other defendant; that about half past 7 o'clock that evening he left with the mother-in-law of Dodds a formal acceptance in writing of the offer to sell the property, which document never in fact reached Dodds; that on Friday morning, the 12th of June, 1874, about 7 o'clock, Dickinson placed in the hands of Dodds a duplicate of said note of acceptance, but he declined to receive it, saying: "You are too late; I have sold the property." It appears that on the day before Thursday, the 11th of June, Dodds had signed a formal contract for the sale of said property to the defendant, Allan, for 800 pounds, and had received from him a deposit of forty pounds.

The vice-chancellor having decreed the specific performance of this alleged contract, the decree, upon appeal, was reversed, and the bill dismissed by the chancery division of the high court of justice, which held "that an offer to sell property may be withdrawn before acceptance without any formal notice to the person to whom the offer is made. It is sufficient if that person has actual knowledge that the person who made the offer has done some act inconsistent with the continuance of the offer, such as selling the property to a third person, and that said document amounted only to an offer, which might be withdrawn at any time before acceptance, and that a sale to a third person which came to the knowledge of the person to whom the offer was made was an effectual withdrawal of the offer."

*Bean* v. *Burbank*, 16 Me. 458, was an action of *assumpsit*, upon the following memorandum in writing: "Shelburne, April 9, 1835. I hereby agree to give Mr. Alpheus Bean a good and sufficient deed of 6,000 acres of the common and undivided land in the town of Shelburne, county of Coos, in the State of New Hampshire, provided he (the said Bean) shall give me satisfactory security for the same, at twenty cents per acre, one fourth part down, and the remainder in three annual payments, with interest annually. This refusal not to run beyond sixty days from date, and this refusal shall be null and void after that time.—BARKER BURBANK."

The trial court, upon objection made by the defendant's counsel that said agreement was void for want of consideration, refused to permit the same to be read in evidence to the jury, and directed a non-suit to be entered, to which ruling of the court the plaintiff excepted. The plaintiff's counsel, in opening the cause to the jury, stated that among other things he should prove that the action was commenced for the benefit of certain individuals, who in a few days after the date of said agreement purchased Bean's interest therein, took an assignment thereof, and paid therefor the sum of $1,200.00, and that they, before the expiration of the term of sixty days therein mentioned, tendered to the said Burbank the sum of $1,200.00 in specie, and also tendered to him one fourth part of said sum in cash, and satisfactory

security for the remaining three quarters, payable in accordance with the terms of said agreement, neither of which said offers was accepted, but each of them was refused; and that Burbank refused to give a deed, assigning as a reason that it was not in his power to do so. The plaintiff then offered to read to the jury the agreement declared on. Whereupon the defendant's counsel objected that the contract or agreement offered in evidence was *nudum pactum*, and void for want of consideration; and the judge who presided ruled accordingly, and directed a non-suit to be entered, to which the plaintiff excepted.

Upon a writ of error to the supreme judicial court the exceptions were overruled. Weston, C. J., delivering the opinion of the court, said: "The agreement upon which the plaintiff declares was a contract for the sale of lands, of which a memorandum having been made in writing, and signed by the party sought to be charged, there was a sufficient compliance with the requirements of the statute of frauds. But the common law requires that such an agreement, to be binding, must have been made upon sufficient consideration. Such consideration need not, be recited or set forth in the instrument, but it must exist in fact, proof of which is essential to its legal enforcement. * * * When the promise declared on was made, there was no consideration moving from the plaintiff. He was not bound, nor did he sustain any damage. If the defendant was bound, he was not only holden to sell for a certain price, but he was deprived for sixty days of the right to sell to others; and this, without any stipulation whatever on the part of the plaintiff. It was a contract all on one side, without mutuality; quite as much so as that of *Cooke* v. *Oxley*, 3 Term R. 654, which failed upon this objection." The syllabus of this case is: "A contract in writing to convey lands at a fixed price, and within a stated time, on the payment of a certain sum, where nothing was paid or agreed to be paid by the other party to obtain such contract, is void for want of consideration."

In *Longworth* v. *Mitchell*, 26 Ohio St. 334, the testator, Nicholas Longworth, being seized in fee of one half of a lot in Cincinnati, by deed leased the entire lot to Mitchell for a

term of fourteen years, reserving an annual rent of $15.00 per front foot for the first seven years, and $18.00 per front foot for the last seven years. The lease contained a provision that Mitchell might elect to become the purchaser of the lot, and have a general warranty deed therefor, at any time within the first seven years at the rate of $250.00 per front foot, or at any time within the last seven years at the rate of $300.00 per front foot, with interest from the date of the lease; and that, in case of such election, the ground-rent paid should be deducted from the interest. Just before the close of the first seven years Mitchell elected to become the purchaser of the lot, and tendered to the executors of Longworth the stipulated $250.00 per front foot, together with some $400.00 ground rent then due, and demanded a deed for the lot; the executors being authorized and required by the will of the testator to fulfill all his real estate contracts.

The executors set up three distinct grounds of defence, the last of which is only necessary to be here noticed, which was "that, prior to the making of the tender, the executors, being in negotiation with the Cincinnati & Indiana Railroad Company for the sale of the lot to that company, Mitchell, who was aware of said negotiation, agreed with the executors that he would surrender his lease to them if they would pay him $2,000.00 and receipt for the rent due, and gave them two weeks in which to accept and comply with the offer; that the executors, relying upon the faith of said agreement or offer, verbally contracted to sell the lot to the railroad company, and within said period of two weeks, to wit, on the 29th day of May, 1864, accepted said offer, and demanded of Mitchell a surrender of his lease, tendering him at the same time said sum of $2,000.00 and a receipt for the rent, but that Mitchell refused to accept the tender, or to surrender the lease; and the executors say they have since conveyed all their interest in the lot to said railroad company in pursuance of their said verbal agreement with the company.

Mitchell replied, denying that he ever made any agreement with the executors to surrender the lease, and alleging that his offer to do so was obtained by misrepresentations as to the value of the lot, and the price which the railroad

company was to pay therefor. The fact that Mitchell made the offer to surrender the lease on the terms set up in the answer of the executors, and that they accepted the offer, and offered to comply therewith on the said 29th day of May, was admitted; but there was a conflict of evidence as to whether this acceptance and offer by the executors were made within the two weeks allowed. The court found that the offer to surrender the lease was made on the 13th of May, sixteen days before it was accepted by the executors, and thereupon rendered a judgment in favor of Mitchell, ordering the specific .execution of the contract as to one moiety of the lot, with a release of title by the railroad company, and a compensation in money by the executors for the value of the other moiety. The record set forth all the evidence in the case, and showed that a motion for a new trial by defendants had been made and overruled.

Upon a writ of error the defendant sought to reverse this judgment on several grounds, of which we need notice only the first and second, viz.: *First,* " the finding of the court that the offer of Mitchell was not accepted by the executors within the two weeks allowed is contrary to evidence;" *second,* " the time allowed for the acceptance of the offer was not material, and its acceptance two days after the expiration of the two weeks was sufficient." In this case the Supreme Court of Ohio held " that where a party makes an offer to sell on specified terms, giving the proposed purchaser the option to accept the terms within a limited period, time is to be regarded as of the essence of the offer, and an acceptance of the terms after the period limited will not be binding "

Welch, C. J., delivering the opinion of the court in that case, said : " As to the question whether the finding of the court that the offer of Mitchell was not accepted within the two weeks is supported by the evidence, it need only be said that a majority of us can not answer the question in the negative, with that certainty which would justify us in reversing the judgment, and granting a new trial;" "nor do we think that the ground assumed by counsel for the plaintiffs in error, that time was not of the essence of Mitchell's offer, is maintainable. The rule frequently adopted

in a court of equity, that time is not of the essence of a contract, does not apply, as we understand the law, to a mere offer to make a contract. The offer rests upon no consideration, and may be withdrawn at any time, before acceptance. An offer without time given for acceptance must be accepted immediately, or not at all; and a limitation of time for which a standing offer is to run is equivalent to the withdrawal of the offer at the end of the time named. A standing offer is in the nature of a favor granted to the opposite party, and can not, on any just principle, be made available after the time limited has expired."

*Eliason* v. *Henshaw*, 4 Wheat. 225, was an action to recover damages for the non-performance of an agreement alleged to have been entered into by the defendants for the purchase of a quantity of flour at a stipulated price. The defendant on the 10th of February, 1813, being at a house about two miles from Harper's Ferry, sent to the plaintiff, by the driver of his wagon, then engaged in hauling flour from his mill about twenty miles distant, to Harper's Ferry, the following letter:

"Capt. Conn informs us that you have a quantity of flour to dispose of. We are in the practice of purchasing flour at all times in Georgetown. * * * If you are disposed to engage two or three hundred barrels at present, we will give you $9.50 per barrel, deliverable the first water in Georgetown. * * * Please write by return of wagon whether you accept our offer."

The letter was delivered to the plaintiffs on the 14th of the same month, to which an answer, dated the succeeding day, was written by them, addressed to the defendant at Georgetown, and was dispatched on the 19th by the first regular mail to Georgetown, in which the writer said:

"Your favor of the 10th inst. was handed me by Mr. Chenoweth last evening. I take the earliest opportunity to answer it by post. Your proposal to engage 300 barrels of flour delivered in Georgetown by the first water, at $9.50 per barrel, I accept, and shall send on the flour by the first boats that pass down from where my flour is stored on the river."

On the 25th of the same month the defendant addressed

to the plaintiff an answer to the above, dated at Georgetown, in which they acknowledge the receipt of it, and add: "Not having heard from you before, had quite given over the expectation of getting your flour; more particularly as we requested an answer by return of wagon the next day, and, as we did not get it, had bought all we wanted."

The question whether this was an acceptance of the defendant's proposal or not was adjourned from the Circuit Court of the District of Columbia to the Supreme Court of the United States, and that Court held that this acceptance, communicated at a place different from that indicated by the defendant, imposed no obligation binding on him; and that an offer of a bargain by one person to another imposes no obligation upon the former, unless it is accepted by the latter according to the terms on which the offer is made. Any qualification of or departure from these terms invalidates the offer, unless the same be agreed to by the party who made it.

Washington, J., delivering the opinion of the court, said: "It is an undeniable principle of the law of contracts that an offer of a bargain by one person to another imposes no obligation upon the former until it is accepted by the latter, according to the terms in which the offer is made. Any qualification of or departure from those terms invalidates the offer, unless the same be agreed to by the person who made it. Until terms of the agreement have received the assent of both parties, the negotiation is open, and imposes no obligation upon either." " Whatever uncertainty there might have been as to the time when the answer would be received, there was none as to the place to which it was to be sent; this was distinctly indicated by the mode pointed out for the conveyance of the answer. The place, therefore, to which the answer was to be sent, constituted an essential part of the plaintiffs' offer." "Their offer, it is true, was accepted by the terms of a letter addressed Georgetown, and received by the plaintiffs at that place; but an acceptance communicated at a place different from that pointed out by the plaintiffs, and forming a part of their proposal, imposed no obligation binding upon them, unless they had acquiesced in it, which they declined doing. It is no argument that an

answer was received at Georgetown. The plaintiffs in error had a right to dictate the terms upon which they would purchase the flour, and unless they were complied with they were not bound by them. All their arrangements may have been made with a view to the circumstance of place, and they were the only judges of its importance. There was therefore no contract concluded between these parties."

In *Faulkner* v. *Hebard,* 26 Vt. 452, it was held that " a contract for the sale of property, which is merely what is termed a refusal of the property by one of the parties, leaving it optional with the other party whether he will take the property within a certain time or not, unless upon some other consideration or under seal, would not be valid in law for want of consideration."

The same principle is laid down in 1 Add. Cont. § 20, in these words: " The contract must be mutual, and the one party can not be bound without the other. If, however, anything has been given or done as the consideration for the promise,—if, for instance, the party to whom it is made has agreed to incur any expense or labor in consideration of the offer being continued or kept open for a certain time,—then the party making the offer is not at liberty to retract it."

While Mr. Story in his excellent work on Contracts, (section 495, *supra,*) and in his work on Sales, (section 126, *supra,*) and Mr. Wharton in his work on Contracts, (section 10, *supra,*) all lay down the rule of law on this subject exactly as laid down by Chitty, Addison, Bishop and Benjamin, as already stated, yet he criticises the rule itself as " not consonant with justice, and in many cases inconsistent with the plain principles of equity."

Mr. Story in his work on Contracts, in section 496, and quoted with approval in his work on Sales, (section 127,) after announcing the rule as hereinbefore laid down, says : " It would, however, seem to be more consonant with justice, and with the agreement of the parties, to enforce a different rule, and to hold that, whenever an offer is made granting to a party a certain time within which he is to be entitled to decide as to whether he will accept it or not, the party making such offer is not at liberty to withdraw it before the lapse of the appointed time, unless by agreement with the other.

95

The reason which is given that the offer is without considera-
tion, and gratuitous until accepted, does not seem to be well
founded. The consideration is the expectation or hope that
the offer will be accepted, and this is sufficient legally to
support the promise. The agreement is therefore to be looked
upon as an engagement by the one party that he will not
sell within a certain time, in consideration that the other
party will consider the matter, and not give a refusal at once.
Again, the making of such an offer might betray the other
party into a loss of time and money, by inducing him to
make examination and to inquire into the value of the goods
offered, and this inconvenience assumed by him is a suffi-
cient consideration for the offer. Suppose that on faith of
the offer he proceed to make arrangements to enable him to
purchase, or to make calculations to determine whether he
is in a condition to buy, or whether the offer is worth accept-
ing, and is fairly exerting his best judgment on the matter,
is there any justice in allowing the other party to interfere
and break his promise, after inducing a loss of time, money,
or inconvenience? Nor does this view of the matter want
authority. The doctrine contended for has been asserted
by Toullier in France, and obtains in Scotland and Holland;"
and he quotes approvingly from Prof. Bell in his late work
on Sales, who reprobates the English rule, and says: "It
seems inconsistent with the plain principles of equity that a
person who has been induced to rely on such an engagement
should have no remedy. * * * The only answer to this
in the English law appears to be that no one is entitled to
rely on a unilateral engagement gratuitously made, and with-
out consideration. But one cannot help feeling that a rule
so different from what commonly happens in the intercourse
of life raises that inconsistency between law and justice
which is sometimes complained of."

Mr. Wharton, discussing the same view of the case, after
correctly announcing the rule, says: "Can a proposer bind
himself to keep open a proposal until a specific date, so that
an acceptance any time within that date be good? That he
can is affirmed by leading authorities in the Roman law,
and there is strong reason on principle to hold that if such
a proposal is communicated to a specific party with the

knowledge of the proposer, and the party addressed has the matter under consideration, the proposer cannot, being advised of this fact, withdraw the offer within the period limited. The person addressed may have several other opportunities of the same kind open to him. There may, for instance, be several houses offered to him for rent, and an inquirer of this class has usually such an option. One is offered to him at a designated rent, a fixed period being given to him in which he is to make up his mind. Trusting to this, he declines others. The very fact of his entertaining the offer, involving a suspension, no matter how slight, of his inquiries in other quarters, is a sufficient consideration to bind the party making to him the proposal." 1 Whart. Cont. § 13. " Whenever there is a wrong there is a remedy; and we are entitled to hold, on principle, that when a proposal to be good for a specific period is thus acted on to the proposer's knowledge, by the party to whom it is addressed, it cannot be revoked within that period. To this conclusion several adjudications tend. " In support of this conclusion he refers to *Railroad Co.* v. *Bartlett*, 3 Cush. 225; 1 Stor. Cont. § 496; 2 Kent Comm. 477, note *b;* *Brooks* v. *Ball*, 18 Johns. 337; *Willitts* v. *Insurance Co.*, 45 N. Y. 45; *Appleton* v. *Chase*, 19 Me. 74; *Train* v. *Gold*, 5 Pick. 380.

Having examined these authorities, we feel that the learned author has said in their behalf all that the most critical examination thereof would justify when he says they tend to support his conclusion; for each and every one of them lays down the same legal proposition that a sufficient consideration for the promise is essential to bind the promisor. If it were necessary to do so, we might safely join hands with Mr. Wharton, and hold with him, on principle, that " wherever there is a wrong there is a remedy ; " but this aphorism is only true of legal wrongs,—that is, where the party is injured in the enjoyment or deprived of some legal right. The reasonings of these distinguished authors above quoted do not, in our opinion, justify the con-clusions which they have drawn from them.

To the question propounded by Mr. Wharton, " Can a proposer bind himself to keep open a proposal until a specified

date, so that an acceptance any time within that date be good we answer: Yes; there is no doubt of it, provided only that there is a sufficient consideration for the promise to keep it open, flowing from the party to whom the promise is made. To constitute such a consideration, it is not necessary that a benefit should accrue to the person making the promise. It is sufficient if something flows from the person to whom it is made, and that the promise is the inducement to the transaction. It may consist of some benefit to the promisor; or some loss, injury or inconvenience to the promisee; or of some money or other thing of value given, exchanged, or paid; or of some promise or undertaking of the promisee to pay, give, or exchange such thing of value; or to incur some trouble or expense; or to do, or to not do, some lawful act; or to surrender, abandon, or suspend the exercise of some legal right,—in consideration of which acts and promises on the part of the promisee the proposer promised that his offer should be left open for a specified time. In all these cases the party to whom the proposal was made and the proposer have entered into a valid contract, founded on their mutual promises, which are a sufficient consideration, whereby the proposer has bound himself to leave his offer open until the time limited has expired.

So, in the case supposed by Mr. Wharton, where the person to whom the offer is made has several other opportunities of the same kind open to him, as where several houses are offered to him for rent, and where one of them is offered to him at a designated rent, and a fixed term be given to him within which he is to make up his mind, and trusting to this he declines others, there can be no doubt that if in consideration that he would decline the other offers, or suspend his determination in regard to them, the party promised to give the "fixed term" in which to make up his mind, and, trusting to said promise, he did decline the others, or suspend his determination as to them, that this promise on his part would make a valid contract with such party, supported by a sufficient consideration to keep open his offer during the specified time. But where the party to whom the promise to keep the offer open for a limited time is made neither pays, nor promises to pay, or to do, or to

refrain from doing, any act in consideration of such promise on the part of the proposer, such promisee is in no manner bound to incur any expense, attention, or care in regard to the proposal. He is free from all obligation in regard thereto, and as a consequence thereof, the proposer is not bound, and may therefore retract his offer at any time before the same is accepted. The party to whom the promise was made having acquired no legal right to enforce the same against the proposer, he can suffer no legal wrong when the same has been withdrawn, and, there being no wrong, there can be no remedy.

The same argument applies with equal force to the reasoning of Mr. Story, that "the consideration is the expectation or hope that the offer will be accepted, and this is sufficiently legal to support the promise." This argument is completely answered by Mr. Benjamin in his work on Sales, § 64. He says: "This appears to be more fanciful than serious. The hope of A. that his offer will be accepted, if he gives B. time to consider it, is not a consideration moving from B. to A., but is the spontaneous emotion of A. arising out of his own act; for, in the case supposed, B. is bound to do nothing, does nothing, gives nothing, promises nothing, to raise this hope. The second consideration suggested by Mr. Story is that 'the making of such an offer might betray the other party into a loss of time and money by inducing him to make examination and to inquire into the value of the goods offered, and this inconvenience assumed by him is a sufficient consideration for the offer.'"

This argument erroneously assumes as a fact that the party to whom the offer is made has in consequence thereof "assumed an inconvenience" and then rests upon this false assumption the conclusion that this inconvenience is a sufficient consideration for the offer, where the party to whom the promise is made is "bound to do nothing, does nothing, gives nothing, and promises nothing to the party making the offer." But there can be no doubt that when a party for a valuable consideration, moving from the party to whom the offer to sell is made, fixes a period within which his offer may be accepted, that he will not be at liberty to withdraw the same until the time so limited by him for such

consideration shall have expired. Whart. Cont. §§ 506, 784. In such case, the party making the proposal has entered into a valid and binding contract, with the party to whom the offer is made, that for the consideration stipulated the offer shall not be withdrawn until the time within which it may be accepted has expired by its own limitation. This consideration need not be expressed in the proposal to sell, but may be proved *aliunde*, as in cases of a memorandum in writing signed by the party to be charged thereby or his agent, required by the statute of frauds, where the same may be enforced, although no consideration appears upon the face thereof.

Where the proposal is to sell to a party a tract of land at a stipulated price, and a period is fixed in the future within which such party may accept the same, if the instrument containing the proposal be a covenant or other obligation, the seal itself imports a consideration for the time allowed for acceptance, which the party making the offer would be estopped from denying. Pom. Cont. § 387, note 1; Bish. Cont. §§ 51, 83, 119. This was in effect the ruling of this Court in *Donnally* v. *Parker*, 5 W. Va. 301, where the paper writing, giving to the purchaser a future day in which he might elect to purchase all or any part of the lands mentioned therein, was in the form of an article of agreement, signed, sealed, and acknowledged by all the parties thereto; and Maxwell, Judge, delivering the opinion of the Court, rests his conclusion upon the fact that the paper writing in that case was more than a mere proposition to sell, but was in fact a convenant that such proposition should remain open for acceptance during the time specified in it.

In *Jones* v. *Noble*, 3 Bush 694, Jones executed the following writing: " This instrument of writing is to certify that I have this day sold to J. R. Shivell a certain tract of land described in a deed which has been duly acknowledged in the Henry County Court clerk's office, which deed is now in my possession, and which is to be delivered to said Shivell on the payment of $2,000.00 on the 25th of December, 1863." Shivell died before the 25th of December, 1863, no part of the money having been paid. His personal representatives some time afterwards offered to pay the $2,000.00, and sued

to recover the land or $500.00 for which Jones had sold it above the price Shivell was to pay for it. Judgment having been rendered in favor of the plaintiffs for said $500.00, the Court of Appeals of Kentucky held that the plaintiffs were not entitled to recover either the land or the $500.00, and that in a conditional sale, the payment of the price on a particular day being a precedent condition of the conveyance and surrender of the possession, time was of the essence of the contract, and the land can not be recovered without the performance of the condition precedent. See, also, *Troy* v. *Clarke,* 30 Cal. 419; *Reed* v. *Breeden,* 61 Pa. St. 460.

From these authorities it is clear that the proposal of John Burr to permit the plaintiff to buy the 500 acre tract of land described in Exhibit A did not of itself constitute a valid contract, whereby he was bound to convey the land to them within the time, at the price, and upon the terms therein mentioned. It is, however, equally clear that if his proposal was unconditionally accepted, and within the time limited he was notified of said acceptance, his proposal would thereby be converted into a valid and binding contract, capable of being enforced against him, provided the plaintiffs within said sixty days had fully complied with the terms thereof; for without such compliance on their part, unless prevented by the proposer, their acceptance would be unavailing.

Where such proposal to sell within a limited time, and upon specified terms, has been made to a party who has unconditionally accepted the same, it is nevertheless essential, to convert such proposal into a valid contract, that such acceptance be communicated within the time limited to the proposer, or that within that time some act be done by the party accepting the proposal which the other party has expressly or impliedly offered to treat as a communication; as, for example, in contracts made by correspondence, by posting the letter of acceptance, or such assent may be inferred from subsequent conduct; but an assent which is neither communicated to the other party, nor followed up by action, is insufficient. 1 Benj. Sales, § 39; *Potts* v. *Whitehead,* 20 N. J. Eq. 59; 1 Story Cont. § 498; 1 Pars. Cont. 483.

If the party making the proposal instantly recalls it before acceptance, although the other party was prepared to

accept the next instant, the offer is effectually withdrawn. But acceptance before withdrawal binds the parties, if made while the offer continues, and, if not withdrawn, the offer does continue in all cases, either a reasonable time, and no longer, or during the time fixed by the party himself. 1 Pars. Cont. 482.

Where parties living at different places are compelled to treat by correspondence through the post, there is a modification of the rule to this extent : that the party making the offer cannot retract after the acceptance by his correspondent has been duly posted, although it may not have reached him, or may never reach him. 1 Benj. Sales, § 44 : 1 Story Cont. § 498. But this modification of the general rule in favor of parties thus compelled to treat by correspondence through the post does not apply to cases where the offer to sell was made to the other party personally. In such case the proposer is entitled to personal notice that his offer has been accepted, and in the absence of proof of any agreement on his part that such notice might be sent to him by mail, or that such notice so sent has been actually received by him within the time limited, there has been no notice of such acceptance, and, unless the acceptance of the offer has been communicated to the person making it, it is of no avail. And, even in cases where notice of acceptance may be sent by mail, it must appear that the letter of acceptance was actually placed in the post-office, and directed to the party making the offer, at the proper place. *Potts* v. *Whitehead, supra.*

Was the proposal of John Burr to the plaintiffs ever accepted by them within the time, at the price, and upon the terms specified therein? We have already shown that, to convert this offer into a valid and binding contract, it was not only necessary that the acceptance of the terms thereof should be unconditional, but that notice of such acceptance should, within the time limited, be communicated to the party making the offer; and that if a condition be affixed by the party to whom the offer is made, or any modification or change in the offer be requested, this, in law, constitutes a rejection of the offer.

The burden of proving this unconditional acceptance of

the terms of the offer, and also that notice thereof was communicated to said John Burr within sixty days from the 7th of June, 1883, rested upon the plaintiffs.    The terms of this offer are :  " I am willing to sell my land on which I reside in the county of," *etc.*, containing ⁻500 acres, more or less, for the price of $6.25 per acre cash ;  " and the parties for whom Mr. F. P. Huxthal are negotiating (*i. e.*, the plaintiffs) shall have the privilege of buying said property at said price, (*i. e.*, $6.25 per acre,) and on said terms, (*i. e.*, for cash) for sixty days from the 7th of June, 1883."

The allegation of the bill that within said sixty days, and long before that period had expired, the plaintiffs notified John Burr in writing that they had elected to and would buy and take said land, at said price, and upon said terms, is explicitly denied by the joint answer of Charles W. Burr and others.    The only evidence introduced by the plaintiffs tending to prove this material and essential allegation of their bill is the depositions of their agent, Harrison Reading, a brother of one of the plaintiffs, and of Alexander F. Matthews, their agent and attorney.    The former testified :

" As the agent of the plaintiffs, I wrote " Exhibit A," and John Burr signed and delivered it to me on the 7th of June, 1883.    During the month of July following I called and told Mr. Burr that the parties above mentioned (*i. e.*, the plaintiffs) would take said property at the price agreed upon, and I proposed to have the deed prepared for execution, to save him the trouble, to which he consented.    At my request, he handed me his deed for said land for the purpose of taking the description.    I then asked who he wished to go before to acknowledge the same.    He said ' Send it to Isaac MacNeel, as I always get him to attend to such matters for me.' I told him the deed would be there in a few days, and for himself and wife to execute the same, ' bring it to Alex. F. Matthews at Lewisburg, and the money would be ready.' He replied that he would do so.    I then employed Uriah Byrd, of Mill Point, to make a survey of said premises, and was present to see that it was carefully done ; after which I returned to Lewisburg, gave Mr. Matthews a copy of the description, and the amount of land contained within the described limits of the survey.    I am a practical surveyor.

I was with Byrd when he surveyed the land. In my opinion, it was correctly done. I watched the chainmen closely, that being the important matter, as all corners were found standing. There was found in said Burr's boundary 467½ acres."

The witness, Alexander F. Matthews, testified as follows : " In the month of June, or early in July, 1883, I was directed by the plaintiffs in the above-named suit, as their agent or attorney, to give notice to John Burr that they had elected and determined to take the tract of land mentioned in the paper filed with their bill as Exhibit A, at the price and upon the terms therein mentioned, and that they were prepared to pay for said land according to said terms, so soon as he should convey the same to them by proper deed. I at once, and I am sure not later than July 15, 1883, communicated the notice to said John Burr by mail. After this was done, and prior to July 28, 1883, I received word through Harrison Reading, from John Burr, requesting me to prepare a suitable deed for said land, and mail it to Isaac MacNeel at Mill Point, where he and his wife would execute and acknowledge it. I accordingly prepared and sent the deed as requested, and did so not later than July 28, 1883 ; and, before the sixty days mentioned in said Exhibit A had expired, the said plaintiffs placed in my hands an amount of money sufficient to pay for said land in full, and I have had the money ever since, and still have it, in readiness to pay for said land, but the deed was never executed or delivered, and hence the money has never been paid. When I received said message as to the deed from Burr, I was furnished by Harrison Reading with a survey and plat of said land, by which the quantity was shown to be 467½ acres, and the deed was so prepared. And further this deponent saith not.—ALEX. F. MATTHEWS."

Purged of the matters of hearsay interwoven by this witness in his testimony, it amounts to the harmless statement that, " in the month of June, or early in July, and not later than the 15th of July, 1883, as the agent or attorney of the plaintiffs, I communicated notice by mail to John Burr that the plaintiffs had elected and determined to take the tract of land mentioned in the paper filed with their bill as Exhibit A at the price and upon the terms therein mentioned, and

that they were prepared to pay for said land according to said terms, so soon as he should convey the same to them by proper deed. After this was done, and prior to July 28, 1883, I prepared a suitable deed for said land, and sent it by mail to Isaac MacNeel at Mill Point, and before the sixty days mentioned," *etc.*

The period of the sixty days from the 7th of June, 1883, mentioned in the option within which the plaintiffs had the privilege of buying said land at the price of $6.25 per acre cash, expired on the 6th of August, 1883. During the whole of that period, and during the whole of said 6th of August, the plaintiffs had the privilege of converting the offer of John Burr into a valid and binding contract by an unconditional acceptance of and compliance with the terms thereof. They could not do so by any other acceptance, nor could they comply with said terms in any other manner than by actual payment or tender of the whole price of the land before the sixty days expired. Neither could they from the terms of Exhibit A withhold such payment, or tender of payment, until a proper deed was executed, acknowledged, and delivered, or until a survey could be made, and the exact number of acres ascertained. It was their privilege to accept unconditionally the terms offered, and comply with the same by paying or tendering the cash within the sixty days, and thus secure to themselves the right to compel John Burr to perform his contract. The delivery of the deed, and the payment of the price of the land, were intended to be contemporaneous acts, and it was not intended that the delivery of the deed should be a condition precedent to the tender of the price.

There is no evidence in this record that the plaintiffs ever accepted the terms offered by John Burr within the sixty days mentioned therein, except the testimony of the two witnesses, Reading and Matthews, already set forth in this opinion. There is no evidence in the record tending to prove that the plaintiffs, or any one for them, ever paid or tendered to John Burr any sum of money whatever, as and for the price of said land, whether the same was estimated to contain 500 or 467½ acres; and the only reason given by the plaintiffs for not paying the money is because of John Burr's

failure to have a deed for said land executed and delivered to them. If it be assumed as true that the witness Matthews communicated to John Burr the precise notice mentioned by him as early as the 15th of July, 1883, yet there still remained to the plaintiffs 22 of the 60 days within which they had the liberty to comply with said terms by paying or tendering to John Burr the cash for the land, and the same may be said as to the notice mentioned by the witness Reading, which was given about the same time.

But it is apparent that the notice of acceptance mentioned and given by the witness Reading to John Burr during the month of July, 1883, was not an unconditional acceptance of the terms offered in said Exhibit A. The statement of this witness, hereinbefore set forth in full, was his response to the following question propounded to him by the plaintiffs' counsel, Matthews:

" Was any notice given said Burr by these parties, ( *i. e.*, plaintiffs,) within sixty days from the date of said paper, of their election and determination to buy said land according to the price and terms set forth in said paper; if so, when and through whom was it given? State in full all you know about it."

To which he answered : "During the month of July following I called and told Mr. Burr that the parties above mentioned would take said property at the price agreed upon."

This is very different from, and falls very far short of, the terms offered in said Exhibit A, which were : " I am willing to sell my land * * * for the price of $6.25 per acre cash; and the parties, *etc.*, ( *i. e.*, plaintiffs,) shall have the privilege of buying said property at said price, and on said terms, for sixty days from," *etc.* What terms? Cash. What was the notice of acceptance communicated to Burr by Reading? That the plaintiffs would take said property at the price agreed upon. On what terms? We cannot tell. The witness has not stated anything about the terms, and yet his attention was particularly called to the terms, and he was asked to " state in full all you know about it," and he has fully answered, and his answer shows that the acceptance was not an unconditional, but was only a partial, acceptance, and therefore in law was no acceptance.

Admitting, for the sake of the argument only, that notice of the acceptance mentioned by the witness Matthews was by him communicated by mail to John Burr, and that the same was received by him within the sixty days, we will consider whether this is an unconditional or modified acceptance of the terms proposed in Exhibit A.

According to this witness, the plaintiffs' acceptance, as communicated by him to Burr not later than the 15th of July, 1883, was " that the plaintiffs had elected and determined to take the tract of land mentioned in the paper filed with their bill as Exhibit A at the price and upon the terms therein mentioned, and that they were prepared to pay for said land according to said terms, so soon as he should convey the same to them by proper deed." This was, in effect, saying to Burr : " We will buy your land mentioned in Exhibit A at the price of $6.25 per acre cash, but we will not pay for it until you shall have conveyed the same to us by proper deed." In other words, they in effect say to Burr that, until you have fully and completely divested yourself of the title to said lands, and as fully and completely invested us with the same, and given up absolute right to the possession thereof, although we are now prepared to pay for it, we will not pay or tender to you a dollar of the price thereof, notwithstanding the fact that such payment or tender of the price to you would bind you to execute to us such conveyance.

This, at the most, is only a modified, and not an unconditional, acceptance of the proposal of Burr contained in said Exhibit A, which, in order to convert the same into a valid and binding contract, must itself receive the assent of said Burr, which was never given. There is nothing contained in said Exhibit A whereby the execution of any conveyance to the plaintiffs was made a condition precedent to the payment or tender of the price of the land, in case they should within the sixty days elect to buy the same at the price of $6.25 per acre.

We are therefore of opinion that neither the acceptance mentioned by the witness Matthews, nor that mentioned by the witness Reading, although they may have been communicated to John Burr within the sixty days, are sufficient in law

to convert the proposal of Burr contained in said Exhibit A into a valid and binding contract for the sale of his land.

But the joint answer of the defendants, Charles W. Burr and others, expressly denies the allegation of the bill " that the plaintiffs, or any one for them, gave notice to John Burr within sixty days from the 7th of June, 1883, that they had determined or elected to and would buy and take said 500-acre tract of land at the price of $6.25 per acre. Without proof of this allegation, the plaintiffs are not entitled to the relief prayed for, and the burden of establishing this fact rests upon them.

The bill also alleges that the notice of acceptance given by the plaintiffs to John Burr within said " sixty days " was in writing, and they neither pretend nor claim in their bill that they ever gave, or authorized any person to give, or that any person for them ever did give to him, any notice of their acceptance, other than a " notice in writing." It does not appear that the plaintiffs ever authorized the witness Reading to give notice of their acceptance of Burr's offer to sell, and it is very clear that the acceptance mentioned and relied on in the bill is not the notice mentioned by Reading.

The witness Mathews, the agent and attorney of the plaintiffs, who according to his testimony was specially directed by them to give notice to John Burr that they had elected and determined to take the tract of land mentioned in Exhibit A, *etc.*, testifies, as we have already seen, that "not later than July 15, 1883, he communicated the notice to said John Burr by mail." This witness does not pretend to say that he ever afterwards saw, conversed with, or learned from Burr that his communication sent to him by mail was ever in fact received by him at any time. We are not even at liberty, in the presence of his deposition, to suppose that this witness did not clearly apprehend the necessity of proving that his communication sent by mail had in fact been received by Burr; for, while unable to testify to this material fact from his personal knowledge, it seems as if he desired to supply it by detailing the statements made to him some time afterwards by the witness Reading. If the witness Mathews could have proved this material fact from his per-

sonal knowledge, it was his duty, both as witness and counsel, to do it, and we must presume he would have done so.

There is no other evidence in the cause tending to show that the notice communicated by Mathews by mail to Burr was ever in fact received by him, and his deposition on this point fails to establish this material fact. The counsel for the appellants lays much stress in his argument upon the statement of the witness Reading in regard to the preparation of the deed, and sending the same to Isaac MacNeel.

The counsel says: " It was mutually agreed that A. F. Mathews was to prepare the deed and send it to Isaac Mac-Neel at Mill Point, where Burr and his wife would sign it. This is practically undisputed. The deed was sent and expected by Burr as he sent for his mail."

In this statement the counsel is mistaken in a most material point. As a witness for the plaintiff said counsel does not pretend to have any personal knowledge on this point.

All he knows he said he learned from the witness Reading, who in his testimony does say that Burr said : " Send it to Isaac MacNeel, as I always get him to attend to such matters for me." This witness then says : " I told him that the deed would be there in a few days, and for himself and wife to execute the same, bring it to Mr. Alex. F. Mathews at Lewisburg, and the money would be ready." He replied he would do so. So far as appears from the testimony in this record, the witness Reading never afterwards had any interview with John Burr in relation to this matter. He does not fix the date of this conversation. He merely says that in "July following" he called, and told Mr. Burr, *etc.*

The witness Mathews testifies that between the 15th and 28th of July, 1883, he was requested to prepare a suitable deed, *etc.*, and that he did so, not later than the 28th of July, 1883, and sent it by mail to Isaac McNeel at Mill Point.

The depositions of Henry N. Thomas, Isaac MacNeel, Catharine J. Burr, Alvin Burr, and William C. Burr were taken on behalf of the defendants. Those of Alvin and William C. Burr were excepted to by the plaintiffs as incompetent. Inasmuch as they claimed an interest in said 500 acres as heirs of John Burr, the objection to their competency must be sustained.

The witness Catharine J. Burr, the widow of John Burr, was present at the interview mentioned by the witness Reading. She testifies that " Mr. Reading came to our house on Sunday morning, about the 18th or 23d of July, 1883,—I can't state the exact date,—and asked my husband for the old deed, and my husband told him he did not do business on Sunday, and would not give him the deed on that day ; and I spoke up and told some of the children to give Mr. Reading the deed, which they did, and he copied from it the courses and distances." To the question, " What was said about sending the deed for your husband to sign ? " she answered, " My husband told him to send his mail to Mill Point. "˙ To the question, " Did Mr. Burr tell Mr. Reading to send any mail of his to Isaac MacNeel ?" she answered, " No ; he never told him anything of the kind." To the question, " Could any conversation have taken place between your husband and Mr. Reading after the conversation you speak of, and during the same day ?" she answered, " No ; he left, and I don't think he ever saw him again."

To the question, " State what was said by Mr. Reading as to buying and paying for your husband's lands," she answered, " Mr. Reading said : ' If we take your land, we will give you ample time to comply within the sixty days, and send your mail to Mill Point.' " To the question, " Do you know of your husband going or sending to Mill Point for mail which Mr. Reading might send or have sent to him ? " she answered, " Yes, sir ; he had a boy working for him, named Henry Thomas, who was sent twice, and Mr. Burr went twice himself. " To the question, " Did Mr. Burr ever get any draft of a deed for his land from Lewisburg ; if so, when ?" she answered, " Yes, he got a form of a deed from Lewisburg on the 17th of August, 1883, when his son Alvin told him the deed was at Mill Point, at Isaac McNeel's." To the further question, " Was Mr. Burr present, or did he have any notice of any survey of his land by Mr. Reading, or any one else ?" she answered, " No ; he was not present at the survey, and he had no notice of it."

The deposition of the witness Henry H. Thomas was as follows : " First question, by F. J. Snyder, atty., *etc.* : ' Were you ever sent by John Burr (during the time you worked

for him in 1883) to Mill Point after his mail? *Answer.* 'Yes, sir; I was there for his mail on the 4th and 11th days of August, 1883. Mr. Burr told me he wanted to see if there was any mail there in regard to his land.' Second question by same : 'Did you get any mail on either day for Mr. Burr?' *A.* 'No, sir; I did not.' Third question by same : 'Did you know of Mr. Burr going for his own mail about the same time? *A.* 'He went about the 28th of July, 1883, and he got the deed some time after the 11th day of August, 1883. I don't know exactly when.' And further this deponent saith not.—HENRY H. THOMAS. "

The deposition of Isaac MacNeel, taken on the 31st of March, 1885, is as follows: " ' Did you in July or August, 1884, receive from A. F. Mathews, by mail, a blank deed, to be signed by John Burr, conveying his land to Weaver & Betts and others ?' *Answer.* 'I did not receive such deed, in 1883, but did receive a deed, I think, in July or August, 1884, and my recollection is that it was to convey his lands to Weaver & Betts,' *etc.* Second question : ' When was he first notified that you had it ?' *A.* 'It was a short time after I received it,—the date I cannot fix.' Third question : ' Did John Burr have any of his mail addressed to you previously, or acknowledge any deed before you ?' *A.* 'He did not. ' Fourth question : ' Was there any understanding between Reading, John Burr, and you that a deed should be sent here for said Burr to acknowledge ?' *A.* There was not.'—ISAAC MACNEEL."

The witness Catharine J. Burr contradicts the statement of the witness Reading, that Burr directed him to send the blank deed to Isaac MacNeel; for she expressly denies that her husband told him to send any of his mail to Isaac MacNeel, or that he told him anything ·of the sort ; and she states that what her husband did say to him was " to send his mail to Mill Point. "

It is evident from this testimony that John Burr expected that the blank deed, which Reading voluntarily proposed to have prepared, would be sent to him at Mill Point; for he not only went to Mill Point himself for mail about the 28th of July, 1883, but he sent the witness Thomas to the same place for his mail on the 4th and on the 11th of August, 1883,

and he told him he wanted to see if there was any mail there in regard to his land, but the witness got no mail for the said Burr on either day. Some time after the 11th day of August, 1883, according to the witness Thomas, and on the 17th of August, 1883, according to the witness Catherine J., John Burr again went to Mill Point, and got the form of a deed from Lewisburg at Isaac MacNeel's, when his son Alvin told him the deed was at Mill Point, at Isaac MacNeel's. According to the testimony of MacNeel, he received a deed in July or August, 1884, not in 1883, that was to convey his land to Weaver & Betts and others, and that he notified Burr that he had it a short time after he received it, but could not fix the date.

From this evidence it is quite certain that at whatever date this blank deed may have been placed in the post-office at Lewisburg, and sent by mail to Isaac MacNeel at Mill Point, it was not received until some time after the 11th of August, 1883, and that, if not sooner received, it was not chargeable to any want of diligence on the part of John Burr. The blank form of the deed received from Lewisburg by John Burr from the hand of Isaac MacNeel, at least sixty days after the sixty days had expired, filed as an exhibit with said deposition of Alvin Burr, is in the words and figures following :

" This deed, made and entered into this the 28th day of July, 1883, between John Burr and Catherine Burr, his wife, parties of the first part, and J. F. Weaver and W. W. Betts, partners composing the firm of Weaver & Betts, U. Emery and R. C. Reading, partners composing the firm of Emery & Reading, and Frank Reading, parties of the second part, witnesseth, that the said parties of the first part, for and in the consideration of the sum of ten dollars to them paid, the receipt whereof is hereby acknowledged, have given, granted, bargained and sold, and do by these presents give, grant, bargain, sell and convey to the said parties of the second part, the following tract or parcel of land of which the said Weaver & Betts, the said Emery & Reading, and the said Frank Reading, are each to have and hold, respectively, one equal undivided third part or interest, viz. : a tract or parcel of land situated in Pocahontas county, W. Va., in the Green-

brier valley, on the waters of Laurel run, which was con-
veyed to said John Burr by William Kellison, by deed re-
corded in the office of the clerk of the County Court of
Pocahontas county, in deed book No. 6, page 308, and is
bounded as follows: Begining at two white oaks on south
side of Round Knob, corner to Daniel Kellison; thence S.
20 W. 20° W. 200 poles to a sugar, red oak and spruce, by a
branch; thence S. 70 E. 400 poles to two white oaks and
white pine, in a hollow, corner to lot No. 1 of the MacClan-
ahan survey; and with same N. 20 E. 172 poles to two white
oaks; thence N. 70 W. 400 poles to the beginning,—con-
taining four hundred sixty seven and one half acres, the
same being one half, or near one half, of lot No. 2 of the
MacClanahan survey. And the said parties of the first part
covenant that they will warrant generally the title to the
property hereby conveyed to the parties of the second part.
Witness the following signatures and seals: —— ——
[Seal.] —— —— [Seal.] "

An inspection of this blank deed, sent by the plaintiffs'
counsel to Isaac MacNeel at Mill Point, to be executed by
John Burr and his wife, satisfies our minds that it was one
he was not bound to execute until he was fully informed by
the plaintiffs of their several and respective interests in the
said land. So far as this record shows, he had never been
informed who the parties were for whom F. P. Huxthal was
negotiating, nor what interest they had or claimed to have in
the land. The consideration, instead of being truly stated at
$6.25 per acre, or at a gross sum equal to the value of 467½
acres, or of 500 acres at $6.25 per acre, is stated as the " sum
of ten dollars, the receipt whereof was thereby acknowl-
edged." And while Burr had held this land since 1854, ac-
cording to the metes and bounds specified in his deed from
Kellison, this blank deed required him to convey all of his
land, but arbitrarily, and without his consent, shortened one
of his lines 28 poles, diminishing the number of acres by
thirty two and a half. This was imposing upon him condi-
tions altogether different, and vastly more onerous, than
those proposed in his offer of the 7th of June, 1883. And
when it is attempted to impose upon him the additional
burden that he shall not only execute and deliver to the

plaintiffs such a deed, but also leave his home in Pocahontas county, and carry the same to the plaintiffs' counsel at Lewisburg, in an adjoining county, upon the assurance of the witness Reading, that when he did so the money would be ready for him, it is perfectly manifest that the plaintiffs never in fact accepted, or intended to accept, unconditionally, the proposal made by him, in such manner as to be binding on themselves.

As already stated in this opinion, so far as the evidence shows, the plaintiffs have never paid nor tendered to John Burr any part of said purchase-money during said sixty days, nor have they done so at any time since; nor does either the witness Reading or Matthews state that they, or either of them, ever informed John Burr that the money was in the hands of said Matthews, or that he was authorized or directed to pay the same, or any part thereof, to Burr.

According to Reading, he informed Burr that when he executed and carried the deed to Matthews at Lewisburg the "money would be ready." And according to Matthews, he says "he informed him," etc., "that the plaintiffs had elected," etc., and that "they were prepared to pay for said land according to said terms, so soon as he should convey the same to them by proper deed." "The plaintiffs placed in my hands an amount of money sufficient to pay for said land in full, and I have had the money ever since, and still have it, in readiness to pay for the said land, but the deed was never executed or delivered, and hence the money has never been paid." The witness Matthews was doubtless a very safe custodian of the money necessary to pay for the land, and as the sixty days had nearly expired, and it was not known what day it might be needed, it was a wise precaution on the part of the plaintiffs to permit it to remain in their counsel's hands until they should direct him to pay the same to Burr.

Was this direction of the plaintiffs ever given to Matthews to pay the same to Burr? And was Burr ever informed that the money was deposited in the hands of Matthews to pay for the land? Upon this last question there is not a *scintilla* of evidence tending to show that this fact was ever communicated to him. Ignorant of the fact that the money to pay

for his land had been deposited in the hands of said Matthews, and uninformed whether the plaintiffs, or any other person, would pay him the money, if he should go to Lewisburg for it, John Burr properly declined to make the journey to that place, from his home in Pocahontas county, in performance of a promise made without consideration to the witness Reading, that he would carry the " deed to Matthews at Lewisburg," which imposed upon him no legal obligation to do so.

And when we consider the terms inserted in the form of the deed prepared by Matthews, and sent by him to John Burr, whereby he was required " to convey " his land to the plaintiffs for the " consideration of ten dollars," and diminishing the number of acres from 500 to 467½, and changing the length of one of the lines thereof from 200 to 172 poles, before they were even " prepared to pay for it," it was the part of common prudence on the part of John Burr, as well as his clear right, to repudiate his said promise made to said Reading, and to stand upon the terms of his offer made on the 7th of June, 1883, which had not and could not have been changed by said verbal promise, that he and his wife would execute the deed, and that he would bring it to Mr. Alexander F. Matthews at Lewisburg.

If the plaintiffs desired to convert said " offer " into a valid and binding contract, binding upon themselves as well as John Burr, it was not only their privilege to accept unconditionally the terms thereof, but it was their duty to comply with them in all respects as far as possible within said " sixty days," by paying or tendering to him the price of the land, and until they did so Burr was in no default; and, not being himself bound, the plaintiffs were not bound, and no action could be maintained by either party against the other.

Having reached the conclusion that the bill cannot be maintained upon its merits, we decline to express any opinion upon the demurrer thereto.

For the reasons hereinbefore stated, the decree of the Circuit Court of Pocahontas county, rendered herein on the 21st of October, 1885, must be reversed, with costs. And, this Court proceeding to render such decree as the said

Circuit Court should have rendered, we are of opinion that the plaintiffs are not entitled to the relief prayed for; on consideration whereof it is adjudged, ordered, and decreed that the plaintiffs' bill be dismissed, and that they pay to the defendants their costs about their defence in the Circuit Court expended.

———

SNYDER, JUDGE, dissenting:

It seems to me, that the foregoing opinion is erroneous in its deduction of legal principles from the authorities and in its conclusion upon the facts in this case. It is especially unfortunate in failing to appreciate fully the difference between an offer and an option.

An offer is a mere proposal without any limitation as to time, and, unless accepted at the earliest practicable time, the law presumes it to be withdrawn; and a subsequent acceptance will impose no obligation on the proposer, although he has done no act and given no notice of its withdrawal.

On the other hand an option is a contract, by which the one party agrees to do some specified act upon the assent or acceptance of the other party within a fixed time. The contract consists of the mutual assent of the two parties, that the proposal shall remain open and continue to be binding upon the proposer for the time specified, or until the other party assents to or agrees to accept the proposal, before the time fixed expires. In order to make such contract binding it is not necessary, that there should be any expressed consideration. It will be sufficient, whether any benefit accrues to the proposer or not, if the other party sustains any loss or prejudice as the necessary or implied consequence of the contract or agreement of the parties; that is as expressed in the foregoing opinion " it is sufficient if something flows from the person to whom it is made, and the promise is the inducement to the transaction. " Upon the assent to or acceptance of the proposal within the time specified, the contract becomes absolute between the parties and their obligations mutual. The contract, then, ceases to be a mere proposal or option, but a contract mutually binding upon both parties, either of whom may compel its specific execution in a court of equity. *Smith's Appeal*, 69 Pa. St. 474;

Pom. Cont. § 169, and notes; *Reynolds* v. *Tompkins*, 23 W. Va. 229; *Vassault* v *Edwards*, 43 Cal. 458; *Hall* v. *Center*, 40 Cal. 63; *Maughlin* v. *Perry*, 35 Md. 352; *Edwing* v. *Gordan*, 49 N. H. 444; *Attix* v. *Pelan*, 5 Iowa 336; *Watts* v. *Waddle*, 6 Pet. 392; 1 Whart. Cont. § 13, and cases cited.

But it is wholly unnecessary to consider or determine these important questions in this case, since it is apparent, that the elaborate discussion of them in the preceding opinion is merely *obiter dictum*. It is in that opinion, conceded, that the paper signed by John Burr, whether regarded as a mere offer or as an optional contract, was a continual proposal for the sixty days' time specified therein, and that, if accepted by the plaintiffs within that time, it became a valid contract binding upon the parties. The only material inquiry therefore in this case is, whether the plaintiffs within the sixty days accepted said proposal in such a manner as to convert it into a valid contract binding both upon themselves and the said John Burr.

In *Mactier* v. *Frith*, 6 Wend. 103, the court, after full and mature consideration, decided the following propositions: From the moment when the minds of the contracting parties meet, signified by overt acts, the contract is obligatory, although a knowledge of such concurrence is not known at the time to both parties. A bargain may be considered as closed, when nothing mutual between the parties remains to be done to give to either a right to have it carried into effect. The death of a purchaser, after a contract is closed, will not prevent the delivery of the goods to his representative. In this case the sale was made by correspondence, and the purchaser died, before he received the letter of the seller accepting the offer to purchase, but, it appearing that the letter of acceptance was written before the death of the purchaser, the court held, that the sale was completed, although the purchaser died without knowing the purchase had been made, or that his offer had been accepted.

Mr. Justice Marcy, in delivering the opinion in that case, says: "What I mean by its [the contract] being closed is that nothing mutual between the parties remains to be done to give to either a right to have it carried into effect;

either can enforce it against the other, or recover damages for the non-fulfillment of it. " Page 115. And again, on page 119, he says: " What shall constitute an acceptance will depend, in a great measure, upon circumstances. The mere determination of the mind, unacted on, can never be an acceptance. Where the offer is by letter, the usual mode of acceptance is the sending of a letter announcing a consent to accept; where it is made by a messenger, a determination to accept, returned through him, or sent by another, would seem to be all the law requires, if the contract may be consummated without writing  There are other modes which are equally conclusive upon the parties.  Keeping silence, under certain circumstances, is an assent to a proposition.  Anything that shall amount to a manifestation of a formed determination to accept, communicated, or put in the proper way to be communicated, to the party making the offer, would doubtless complete the contract; but a letter written would not be an acceptance, so long as it remained in the possession or under the control of the writer.

Where the offer is in writing, the acceptance may be by parol. It need not be in writing to constitute a valid contract, capable of being enforced in a court of equity, or for the recovery of damages for its breach at law. *Cape-hart* v. *Hale*, 6 W. Va. 547; *Creigh* v. *Boggs*, 19 W. Va. 240.

In the case at bar the witness, Harrison Reading, testifies, that he as the agent for the plaintiffs wrote the body of the paper constituting the option, and that John Burr signed it in his presence; that in July following he called on Burr and told him, the plaintiffs would take said property at the price agreed upon; that Burr handed him his deed for the purpose of getting a description of the land, by which the witness was to have a deed prepared and sent to MacNeel before whom he was to acknowledge it.  This witness then testifies : " I told him that the deed would be there in a few days, and for himself and wife to execute the same, bring it to Mr. Alex. F. Matthews at Lewisburg, and the money would be ready.  He replied that he would do so." This testimony is corroborated by Mrs. Burr, who testifies that in July, 1883, Mr. Reading got the old deed from her husband to prepare a deed for them to execute, and that the same

was to be sent to Mill Point, where MacNeel lived. The testimony further shows that Burr afterwards got the deed which had been prepared for him to execute from MacNeel, but whether it had been sent to Mill Point before or after the sixty days had expired does not appear, but the circumstances tend to show that it had.

Do these facts constitute an acceptance of the proposal on or before the 7th day of August, 1883, the date at which the option expired? If the acceptance was made within the sixty days, it became an absolute contract, mutually binding upon both the parties. But, in order to complete the contract, it must be accepted unconditionally and according to its terms, unless the terms are waived or altered by the consent of both the parties. The option provided that the sale should be for cash, but is silent as to the time of the conveyance of the land. The sale is by the acre, but the quantity of land is left uncertain by the words "more or less" in the option. The gross sum to be paid is not fixed, but the price is fixed at $6.25 per acre for 500 acres more or less. It is apparent therefore from the face of the paper, that it was a sale by the acre of an uncertain number of acres. In order to fix the quantity of land, so as to determine the gross sum to be paid, a survey was indispensable, and this must have been contemplated by the parties. It was as much the duty of Burr as it was of the purchasers to ascertain the number of acres sold, because that was necessary to fix the amount to be paid. Without having the gross price thus determined Burr could not make a demand for the sum due him, and the purchasers could not pay or even tender the purchase-money. It is also a well-settled principle of law that a sale of land for cash makes the payment of the price and the conveyance of the land dependent and contemporaneous acts. *Runkle* v. *Johnson*, 30 Ill. 328. In this option no provision is made for any conveyance. This of itself is the best evidence that the conveyance was to be made at the time the purchase money was paid; for, if payment is to precede the conveyance, then the purchaser will have no means of compelling the conveyance. The contract makes no provision for such conveyance either before or after payment; and therefore according to its terms no action or suit could be brought to compel a conveyance.

98

This was the situation, in which Burr and the plaintiffs' agent, Reading, found the facts in July, 1883, when they met, and Reading informed Burr, that the plaintiffs would take the land at the price agreed upon. It is evident both from the necessity of the case and the acts and conduct of the parties, that both Burr and Reading understood, that the acceptance then made was absolute and unconditional according to the exact terms prescribed in the option. Neither of them supposed, that the acceptance did not cover all the terms of the offer. Burr being an honest and sensible man knew, that it would be unreasonable as well as impracticable to demand the purchase-money at that time or to expect or desire payment, until the survey had been made, and he had executed and was ready to deliver his deed for the land. He understood his offer required this of him, as it unquestionably did; and therefore he promptly assented to Mr. Reading's suggestion and voluntarily agreed to go to Mill Point, get the deed, acknowledge it and then take it to Lewisburg and get his money upon its delivery to the plaintiffs' attorney. This did not involve any modification of the terms of the written option. It was simply a convenient and satisfactory mode agreed upon by both to carry into effect the contract, which had already been completed by the unqualified acceptance of it by Reading for the purchasers. If Burr did not understand the acceptance was absolute, or if he desired a more formal and definite acceptance, it was his duty then and there to say so, in order to give Reading an opportunity to make it complete and satisfactory to him.

In *Stone* v. *Tyree*, Green, Judge, quoting with approval from *Jowers* v. *Phelps*, 33 Ark. 468, says : " A party who by his acts, declarations, or admissions, or by failure to act or speak when he should do so, either designedly, or with willful disregard of the rights of others, induces or misleads another to conduct or dealings which he could not have entered upon but for this misleading influence, will not be allowed afterwards to come in and assert his right to the detriment of the person misled. This would be a fraud." 30 W. Va. 702 (5 S. E. Rep. 878).

In this instance Burr did not even remain silent, but in the most direct manner affirmed that the acceptance was

satisfactory to him, and then agreed upon the arrangement for carrying the accepted and completed contract into effect, which he in words assented to as being also satisfactory to him.    The ingenuity and verbal analyses so extensively indulged in the preceding opinion, in order to escape the plain common-sense meaning of this transaction, never occurred to John Burr.    It is evident that he at that time fully intended and was no doubt anxious and willing, that the sale should be carried into effect.    The probability is, that this purpose continued, until he received the deed sent him to execute, and he found that the quantity of land was less than he had expected it to be.    It is possible, that he desired a resurvey of the land or some explanation of the variance and for this reason delayed executing the deed and then died still intending to perform his part of the contract.    But, be this as it may, it is certain that he never, during the sixty days the option was in force or at any other time during his life to his family or any one else questioned the validity of the contract he had made or attempted to repudiate or deny, that it was binding upon him.

When the contract became thus completed by the acceptance of the option, the limit of sixty days ceased to have any force.    The mutual obligations and rights of both parties from the time of the acceptance depended upon the contract without regard to the limit fixed for the acceptance of the option.    There was nothing in the contract thus completed, which would make it inoperative and void unless carried into effect in sixty days.    The parties agreed upon the manner of executing this contract.    The agent of the plaintiffs was to send the deed to Mill Point, and Burr and wife were to execute it, and then Burr agreed to take it to Lewisburg, deliver it to the plaintiffs' attorney and get the purchase-money.    It was not a condition of this agreement that the deed was to be sent to Mill Point within the sixty days or within any other fixed time.    The deed was however sent in a short time, and was received by Burr.    Whether it was within the sixty days or not is wholly immaterial.    The plaintiffs fully complied with their part of the agreement, and the only failure to carry out the agreement was on the part of Burr, who, after he received the deed, neither executed nor took

it to Lewisburg, as he had agreed to do. Neither he nor his representatives can be heard to set up his own default as a ground for avoiding the contract.

The legal effect of the contract, as we have seen, as well as the positive agreement of the parties entered into at the time the option was accepted was, that the conveyance and payment of the purchase-money were concurrent and dependent covenants or acts. If either wished to put the other in default, it was incumbent upon him to offer to perform his part of the agreement,—that is, before Burr could put the plaintiffs in default, it was his duty to tender the deed, as his contract and agreement required him to do; and, *vice versa*, in order to put Burr in default, it was incumbent upon the plaintiffs to tender the purchase-money to him.

Neither of these things was done, until this suit was brought, and consequently there was until that time no legal default by either party. But when the plaintiffs brought this suit and tendered with their bill the purchase-money and demanded a conveyance of the land, then the representatives of Burr by refusing to convey were put in default. If Burr or his representatives had sued for a specific performance of this contract, they would have been compelled to tender a deed before they could obtain a decree for the purchase-money. This is the universal practice in the courts of this State.

In *Snodgrass* v. *Wolf*, 11 W. Va. 158, this Court held "that covenants are dependent or independent according to the intention and meaning of the parties and the good sense of the case, and technical words should give way to such intention;" citing *Brockenbrough* v. *Ward*, 4 Rand. (Va.) 355.

Without further prolonging this discussion in a matter, which I regard too plain for any serious difference as to the result, I am of opinion, that the decree of the Circuit Court was clearly right, and should be affirmed.

REVERSED.