| 33 | 738 |
| 35 | 104 |
| 35 | 470 |
| 35 | 744 |
| 33 | 738 |
| 39 | 154 |
| 33 | 738 |
| 42 | 541 |
| 33 | 738 |
| 41 | 689 |
| 33 | 738 |
| 46 | 2 |
| 46 | 3 |
| 33 | 738 |
| 47 | 101 |
| 33 | 738 |
| 54 | 40 |
| 54 | 340 |
| 33 | 738 |
| e56 | 164 |
| 56 | 173 |
| 33 | 738 |
| 63 | 162 |
| 33 | 738 |
| 65 | 312 |

# CHARLESTON.

## BARRETT v. McALLISTER.

*(ENGLISH, JUDGE, absent.)

Submitted January 25, 1890.—Decided March 15, 1890.

1. OPTIONS.

A unilateral contract, commonly called an "option," proposes to sell land for cash, "if paid within fifteen days." There must be acceptance of it within the fifteen days, and notice of such acceptance to the proposer within the same period; otherwise the option is at an end.

2. OPTIONS—NOTICE.

If the proposer is not, within the said period, ready and able to deliver to the holder of the option a deed conveying the land, and the holder of the option knows that fact, and declares to the proposer, within the period, his willingness and intention to pay the purchase-money simultaneously with the delivery of such deed, and there is good reason to believe on the part of the proposer that though the holder of the option has not actual current money then to pay or tender to the proposer in payment for the land, yet he has credit and ability to give bank-checks, which would be honored by the time the deed can be delivered, but which the proposer refuses, or that he will have the actual money present for payment by the time the deed can be delivered, and the holder of the option has, within the period, accepted it and given notice of his acceptance to the proposer, then the failure of its holder to pay or tender the purchase-money within the period will not lose to him the benefit of the option, though such payment or tender was demanded of him by the proposer within the period.

3. OPTIONS—DEED—PAYMENT.

The obligation of such proposer to deliver such deed and the obligation of the holder of the option to pay the money are mutual and dependent, and are to be performed simultaneously.

4. OPTIONS—THIRD PARTY—TRUSTS AND TRUSTEES.

A third party who, with notice of such equity of the holder of such option, purchased the land from such proposer, takes it subject to the rights of the holder of the option, and holds it in trust for him, and the latter may in equity follow the land into the second purchaser's hands, and compel him to convey the land to him.

5. OPTIONS—SPECIFIC PERFORMANCE.

In a suit in equity against the proposer of such option and the second purchaser, the holder of such option may pray for the specific execution of the contract by a conveyance of the land to him from them, or, in the alternative, for the purchase-money which the second purchaser agreed to pay, and the one or the other relief may be decreed according to the circumstances, or as the plaintiff may elect. But in case there shall be a decree, not for specific execution, but for money, the decree must be against the proposer in such option, and not against him and the second purchaser, or against the latter alone.

6. OPTIONS—SALE.

In case of such a decree for money, and not for specific execution, it is proper to hold the land bound for its payment, and to decree its sale for non-payment.

7. OPTIONS—ANSWER—STATUTE OF FRAUDS

When an answer admits an agreement for the sale of land as alleged in the bill, though it be oral, the defendant must plead the statute of frauds and perjuries, or the answer must claim its benefit; otherwise he is held to have admitted the agreement, and renounced the statute's benefit.

8. OPTIONS—ANSWER—STATUTE OF FRAUD.

If the answer denies generally the making of any such agreement as that alleged in the bill, the plaintiff must prove an agreement valid under the statute; but if the answer admits an agreement substantially the same as that alleged in the bill, and differing from the agreement alleged in the bill in points not essential, the answer is treated as admitting the agreement, and, unless the defence under the statute is made by plea or answer, the statute will not avail the defendant.

9. OPTIONS—THIRD PARTY—NOTICE.

When a party purchases land with notice of an equity in a third party, in a suit by such third party to enforce his equity, brought after such purchase, such purchaser is a necessary party, if relief by way of sale of the land is given, unless it appear either that he had notice of the suit pending at the time of his purchase, or that notice of *lis pendens* had been recorded under section 13, c. 139, Code 1887, before such purchase.

10. OPTIONS—SALE—PARTIES.

It is error to decree land to be sold in which a person not a party to the suit has an interest, legal or equitable.

11. NON-RESIDENT—BILL TAKEN FOR CONFESSED—PERSONAL DECREE.

It is error to take a bill for confessed against a party proceeded against as a non-resident, and render a personal decree against him if he has not appeared in the cause.

*Brown & Jackson, W. M. McAllister* and *C. P. Jones* for appellants.

*Knight & Couch* for appellee Barrett.

BRANNON, JUDGE:

In June, 1887, Frank Barrett brought this suit in the Circuit Court of Pocahontas county against William McAllister and others, alleging in his bill that on April 8, 1887, William McAllister, Samuel C. Tardy, and Samuel C. Tardy, Jr., owned a tract of land in Pocahontas county containing 4,711 acres, composed of several contiguous parcels conveyed by a deed exhibited with the bill; that on April 8, 1887, he entered into negotiations with said McAllister and Tardys, through McAllister, acting for himself and said Tardys, for the purchase of 2,500 acres, part of said 4,711 acres, and said defendants made a verbal agreement to sell him the 2,500 acres for $1.25 per acre, half to be paid in cash, the balance in twelve months; that McAllister furnished Barrett with a plat of the 4,711 acres, showing the parcels composing it, and designated the 2,500 acres embraced in the verbal contract as made up of lots 8, 9 10, and 11 on the plat, containing, respectively, 440, 415, 530, and 547 acres, and so much of lots Nos. 6 and 7 on said plat as would make up the 2,500 acres, by running a line from the most southerly corner of lot 6 to the eastern side of lot No. 7, taking that part of lots Nos. 6 and 7 on the west of said line. The bill further alleged that Barrett asked that the contract be reduced to writing; that on the 25th of May, 1887, said McAllister, for himself and co-owners, made a proposition in writing, signed by McAllister, to sell to Barrett 2,500 acres of timbered land in Pocahontas county, meaning the 2,500 acres above described, and about which said verbal negotiations had previously taken place, for $1.25 per acre cash, if paid within fifteen days after the 25th day of May, 1887; that after the making of this proposition, and before its acceptance by the plaintiff, to wit, on June 6, 1887, McAllister went with plaintiff on the land, and pointed out the 2,500 acres, and pointed out on a plat said 2,500 acres as embraced within lots Nos. 8, 9, 10, and 11, containing 440, 415, 530, and 547 acres, respectively, laid down on said plat, and so much of lots Nos. 6 and 7 thereon adjoining lots 8 and 9 as would be required to make up the 2,500 acres

by running a line from the most southerly corner of lot No. 6 to the eastern side of lot No. 7; that after the 25th of May, 1887, and before the 9th day of June, 1887, to wit, on the 7th day of June, 1887, he accepted said proposition of sale, and notified said owners of his acceptance; that on the 7th day of June he was ready to pay, and offered to pay, said owners the purchase-money, and demanded a deed, but they refused and failed to execute such deed, and on the 10th day of June, 1887, entered into a written contract, agreeing to sell to D. W. Hile, acting for himself and Anthony Bloom and Eli Bloom, said lots 8, 9, 10, and 11, embraced in said contract of sale to the plaintiff, and lot 7 and part of lot 6, if Hiles and Bloom should so elect, part of which two lots were also embraced in the sale to plaintiff. The bill further alleges that in the sale by McAllister and the Tardys to Hile and Blooms the vendors were to receive $2.25 per acre; and that said vendors entered into negotiations with Hile for the purchase about the 8th of June, 1887, and that McAllister and Tardys really agreed to sell to Hiles and Bloom on or about the 8th of June, because they were getting one dollar more from Hile and Bloom than from plaintiff, and that this was the reason why they refused to keep their contract with the plaintiff.

The bill further alleges that when Hile began negotiations for such purchase he had notice of the contract between plaintiff and McAllister and Tardys, and that they conspired fraudulently to cheat and defraud the plaintiff out of the land; that the plaintiff was still ready and willing to comply with his contract, and pay the purchase-money, upon the execution of a proper deed, and he demanded the same, and prayed that McAllister and Samuel C. Tardy and Samuel C. Tardy, Jr., be compelled to make him a deed for the 2,500 acres of land upon his payment of the purchase-money, and that defendants D. W. Hile, Anthony Bloom, and Eli Bloom be compelled to join in the deed, or, if such specific performance could not be had, that the court would adjudicate that the sale to Hile and Bloom was a sale for the use and benefit of the plaintiff, and that he be decreed $2,500.00 of the purchase-money which Hile and Bloom were to pay for the land, that being the excess which they paid over what

the plaintiff was to pay for the land, and that he have a personal decree against the defendants therefor, and against the land for payment thereof.

The answer of McAllister denies the allegation of the bill that on April 8, 1887, he entered into negotiations with Barrett for the sale of 2,500 acres of land, or that he then made any agreement to sell plaintiff any of said land at any price, or that he furnished a plat to the plaintiff showing said 2,500 acres, or designated the part which would go to make up the 2,500 acres, or that any line was agreed on to designate any certain part which he was willing to sell. He denies that he was ever required to put the alleged verbal contract in writing, and says that, on the contrary, all that was ever said by plaintiff was contained in a letter of May 11, 1887, in this language: "I do not want an option, but simply write me that you will sell to me at $1.25 per acre, if I come before sold, and that you will hold it open fifteen days for me." He admits that he wrote the letter filed with the bill, but says that no body of said land had been or was afterwards designated as said 2,500 acres. He says that when he went with plaintiff on the land on June 6, 1887, he told the plaintiff that any sale would have to embrace lots Nos. 8, 9, 10, and 11, but that no parts of lots Nos. 6 and 7 were specially designated, and no line through them was agreed upon. He denied that Barrett, on June 7, 1887, accepted the proposition contained in said letter, and was then, or on the 8th or 9th of June, 1887, ready to pay, and offered to pay, the purchase-money, but, on the contrary, made no tender of any money, but that he (McAllister) said to Barrett that if he would tender the money in cash that he and his co-owners would make him a deed before taking possession of the money, and that Barrett might in the mean time deposit the money in any hand he saw fit. This answer admits that on June 10th, 1887, McAllister and his co-owners sold to Hile and Bloom 2,514 acres of the 4,711 acres at $2.25 per acre, but denied that negotiations for this sale were commenced on June 8th, or that any negotiations or sale were made until the 10th of June: and denied that this sale was the reason why he did not sell to plaintiff. Samuel C. Tardy and Samuel C. Tardy,

Jr., filed an answer denying that they were bound by the contract alleged in the bill, inasmuch as the payment of the money at the expiration of fifteen days from May 25th was a condition precedent to the efficacy of the contract, and no payment has been made. This answer adopted the said answer of McAllister.

Though D. W. Hile, Anthony Bloom, and Eli Bloom were not served with process, and did not appear, but were proceeded against as non-residents, the decree recites that the cause was heard on the bill taken for confessed against them. This decree was that the plaintiff, Barrett, recover of the defendants $2,500, with interest from June 10, 1887, and costs, said sum being the excess of the sale made to Hile and Bloom over the sale to Barrett; and the decree provided that, on failure of payment, the land be sold. From this decree McAllister and Samuel C. Tardy and Samuel C. Tardy, Jr., took an appeal; and since it was granted D. W. Hile, Anthony Bloom and Eli Bloom have appeared in this court, and joined the original appellants in complaining of said decree, and adopt the petition filed by said original appellants, assigning errors as their own.

I here insert the letter written by McAllister to Barrett, on which this suit is based : "Warm Springs, Va., May 25, '89. Frank Barrett, Esq.—My Dear Sir : Yours of the 22d instant, mailed on the 23d, just to hand. I have heard from my parties, and they authorize me to say that we will take one dollar and twenty five cents per acre cash for 2,500 acres of timbered land in Pocahontas county, West Va., if paid within fifteen days. That will run us to the 9th June *proximo ;* so let your parties know, and come on at once. My parties are not anxious to sell, but, under my advice, they have consented to do so at the price named. There will be no time to lose. Write me at once what day to look for you, as I wish to have my men join us, and they reside in Lynchburg. Yours, very truly, WILLIAM MCALLISTER."

A vital question is whether the proposal contained in the letter was, within the 15 days limited by it, accepted by Barrett, and his acceptance make known to McAllister; for if it was not both accepted, and the acceptance communicated to McAllister, the option is at an end. *Weaver* v. *Burr*,

31 W. Va. 736, (8 S. E. Rep. 743). This question is to be answered by the evidence. Barrett, as he informed McAllister by letter, designed to sell the land to others at a larger price than he was paying for it, and said to McAllister that, but for what he expected to make, he would not engage in it. On receiving the option, Barrett, in company with D. W. Hile and J. B. Walker, who resided in Pennsylvania, went to McAllister's residence at Warm Springs, Va., and informed McAllister that he and the parties with him had come to inspect the land, and would buy it, if, on inspection, it suited them; and on June 4, 1887, they started to go to the land, and spent several days on the land examining it. While there they were joined by S. C. Tardy, Jr. Barrett's evidence is that on the evening of the 7th of June, after examining the land, he told McAllister that he was satisfied with it, and would take it, and pay him the money whenever he made the deed ; and that on the morning of June 8th he told McAllister that he was satisfied with the land, and was ready to pay the money when he made the deed. On June 9th the parties all went to Huntersville. Barrett states that he asked McAllister how long it would take to get the deed from Lynchburg, McAllister having informed him a few days before that one of the owners of the land and his wife, who would have to join in the deed, lived in Lynchburg, Va., and McAllister replied that he did not know exactly, but he supposed two or three days. Barrett proposed to go to the Warm Springs, and remain there until it was settled up, and asked if that would be satisfactory ; and McAllister replied, "Yes, if every thing is satisfactory ;" and Barrett asked what he meant by "satisfactory," and whether he had not told him two days before that he was ready to take the land and pay the money whenever he made the deed; and that McAllister then demanded that the currency should be counted down then and there, and he would give a written agreement to make the deed, and that he (Barrett) replied that he did not do business in that way ; that, if he were buying on time, an agreement to make a deed when the last payment was made would do, but he was paying cash and required a deed when the money was paid; and that McAllister's reply was, "I know my business, and the trade is off." McAllister states

that, on June 9th, Barrett asked him something about how long it would take to hear from Lynchburg, and he replied that he did not know exactly, but thought if would take a few days; that Barrett said something about their executing a deed for the land, and about going to the Warm Springs to wait for a deed to be prepared and executed. McAllister says he said to Barrett that, if everything else was satisfactory, and he paid the money, they could easily manage about the deed; but Barrett said he could not pay the money, but would give a check or checks, which McAllister refused.

Just here let us note that both McAllister and Barrett concur that at Huntersville, on June 9th, after they had inspected the land, they talked about the execution of a deed, and how long it would take to get it from Lynchburg, and about going to Warm Springs to wait until a deed could be prepared and executed. Why talk about the execution of a deed, if the land was not satisfactory? Why talk about a deed, if Barrett had not accepted the option? The fact that they so talked about a deed proves that Barrett had accepted the option and informed McAllister of it; indeed, this conversation about a deed is of itself acceptance. Furthermore, McAllister says that Barrett offered a check or checks in payment. Why talk about checks as payment had there been no acceptance? Does not this confirm Barrett when he says he told McAllister that the land was satisfactory, and he would take it and pay for it? McAllister does deny that Barrett informed him on the 6th or 7th of June of his acceptance, but he does not deny that in this conversation at Huntersville, on the 9th, Barrett stated to him that he had informed him of his acceptance two days before, or that on that day he told him he would take the land. McAllister himself states that in this Huntersville conversation, on June 9th, the contention between him and Barrett consisted in this: that McAllister asked money and refused checks, whereas Barrett demanded a deed before payment. This presupposes an acceptance of the proposal by Barrett, and a knowledge of it by McAllister. Barrett and Walker, on the 9th of June, went to Warm Springs, reaching there the same day, and McAllister, Hile, and Tardy started for that point together, but stopped over night at Mountain Grove.

On June 9th Barrett left this paper at McAllister's residence at Warm Springs: "June 9th, 1887. To W. M. McAllister, Warm Springs, Va.—Sir: You will take notice that in accordance with your letter of May 25, in which you sold me 2,500 acres of land in Pocahontas county, W. Va., at one dollar and twenty five cents per acre, if the same were paid for by June 9th, 1887, I am here at your place of business, ready to take the land and pay the money whenever the deed is made. I will remain here until 6 P. M. June 10, 1887. Very resp'ly, FRANK BARRETT." On the morning of June 10th McAllister received it. Both Hile and Walker say that Barrett, on the morning of June 8th, told them he had closed the contract with McAllister. For these reasons we must say that Barrett, within the fifteen days, accepted this proposal, and communicated the fact of his acceptance to McAllister.

Now comes another important question in the cause, namely, whether, though Barrett did, within the period limited, accept the option, such acceptance was unavailing, because he did not within such period pay or tender the purchase-money for the land when the vendors were not ready to deliver a deed. It is clear that he neither tendered nor paid money. In *Weaver* v. *Burr, supra,* 31 W. Va. 736, (8 S. E. Rep. 743) there was a difference of opinion in this Court upon the question whether, in such an option, both acceptance and payment or tender of purchase-money must occur within the period limited in the option—three of the judges holding that there must, within that period, be acceptance, notice thereof, and payment, or at lest tender, of the purchase-money; while Judge SNYDER was of opinion that, when acceptance and notice occur within the period, the option becomes thereby an ordinary executory contract, and the period limited is unimportant; at least, the right to execution does not alone depend on that period. In the present case it is clear that Barrett had no actual money with which to make the payment, but it is reasonably certain that Barrett could and would have paid the money by checks which would have been honored; but it is also clear that McAllister refused checks, and demanded actual money, or a tender of actual money. Walker says that he bargained with Barrett to buy three fifths of the land, at $2.25 per acre,

and that he would give him a check if the title was all right.

It is proven by the cashier of the Clearfield National Bank of Clearfield, Pa., that at that time Walker's check would have been good for $3,375.00, which would have more than paid McAllister. The cashier states that Walker's check had always been, up to the date of his deposition, good for any amount for which he would draw. Barrett asked McAllister to telegraph, at Barrett's expense, to said bank to learn whether Walker's check would be good, which he declined to do. Barrett says he named J. B. Walker in his request to McAllister to so telegraph, while McAllister and another witness, while admitting that such request to telegraph was made, say that Walker's name was not mentioned. It would be reasonably expected that Barrett would name the person as to whose credit it was proposed to telegraph, but, if he failed in naming the person, of course that would have been made known when the telegram should be drawn, had McAllister assented to the proposition to telegraph. On June 9th, Barrett telegraphed said bank, asking whether Walker's check would be good for $3,500.00, and under date of June 10th received reply from the bank that it would be good. Barrett had Clarence L. Barrett's check for $2,-500.00. There is some evidence tending to show that Barrett had told McAllister that this check was not to be used ; but Clarence L. Barrett was a brother of Frank's, and was in close relations to him in business, and he was interested in this transaction, and had agreed to take a fifth share, and, had there been need of the check, it is fair to say that it could have been used. And Hile went there to buy and pay for a share, and, had not a negotiation sprung up between him and McAllister resulting in a sale to Hile, it is reasonable to say, as Hile was anxious to have a share as shown by Bloom's evidence and the fact that he did buy of McAllister, and indeed his own deposition, Hile would have furnished a considerable part of the money. Barrett had told McAllister before this that the men whom he would bring to see the land were the men who would furnish the money. Barrett in his evidence says he expected Walker's check to go direct to McAllister, and, in speaking of his further resources to pay for the land, said :

"I had an arrangement with J. S. Blackaller, cashier of First National Bank, Gallipolis, Ohio, who is and has been a partner with me in real estate transactions, who has and does furnish me with money to carry on my real estate transactions. Mr. Blackaller is a silent partner. I had no specific arrangement with him to furnish money in this particular instance, but he is interested with me in this matter. He has always honored my checks whenever I have written or telegraphed him to do so. I also have a gentleman worth $25,000.00, who always indorsed my note whenever I ask him. I also had a telegram from the Clearfield Bank that Mr. Walker's check was good for $3,500.00. From these sources I knew I could get the money."

No showing is made that these reasons to sustain Barrett's ability to pay were groundless. And, in connection with the subject of Barrett's ability to pay, it is to be added that McAllister, before this transaction, handled two of Barrett's checks, one for $600.00, and one for $20.00, which were duly honored. Thus I think it entirely safe to say that Barrett was able to obtain means to pay for the land, and that McAllister had reasons to believe and know that checks could be given him, if he was willing to take them, which would realize the money; or, if he chose not to receive them, that he knew Barrett could and would have the actual money there by the time a deed could be prepared and executed by him and his wife, and then sent to Lynchburg to be executed by Samuel C. Tardy and wife, and returned to Warm Springs. Barrett was willing and anxious to pay by checks, but McAllister refused this mode of payment, and demanded actual money, or at least tender of it.

Was Barrett bound to pay or tender within the fifteen days? It is beyond question that, had Barrett tendered money on any day within the fifteen days, no delivery of a deed to him could have been made, for not the mark of a pen in the preparation of the deed had been made. The land was owned equally by McAllister and the two Tardys. When at Warm Springs, about to go to inspect the land, Barrett told McAllister that, if the land suited the parties, they would pay for it, and would want the deed to take home with them; and McAllister said they would have to

go to Lynchburg to get the signature of one of the parties and his wife; to which Barrett replied that it was out of the way, and he (McAllister) would have to get the deed, to which McAllister assented. Up to this time it seems that McAllister, if the option should be accepted, would not stand on the payment of money literally within the time, for there would not likely to be time enough from then for the the trip to the land and its inspection, and the return, and the completion of a deed, within the fifteen days; and he must have expected that, in case of acceptance, he would ask a few days' extention in which to procure the deed. The matter he was then anxious for was acceptance of the option, as he had written Barrett to hurry and bring on his parties. When, therefore, McAllister demanded actual money, and refused checks, though he had plenty of time to forward the checks for payment before he could get the deed, and the checks if not honored would not be payment, and he had yet the title in his keeping so that he would not be required to deliver the deed unless the checks had been paid—when, I repeat, he thus demanded money, he had no deed ready to deliver.

Could he demand the money when he had no deed on his part to deliver? He certainly could not claim that the money should be paid to him before the delivery of a deed; for that would put Barrett to the hazard of some of the parties failing to execute the deed, or of its being defective in form or effect, and of the inability or refusal of McAllister to refund. Could he demand, if not actual payment of money, a tender? It would seem that it would be doing a useless thing to make a tender which could not be consummated by payment, seeing that the vendor could not deliver a deed. A tender was not needed to show willingness to pay, for acceptance had shown that. It would show ability to pay, it is true, so that the vendor, after a tender, could not fear that it was useless to go on and prepare the conveyance. It would only show ability to pay, and this, for reasons above given, we think is shown to a reasonable certainty. So that, practically, in this case, all which a mere tender would show was shown by the fact that Barrett could give solvent checks, which would have been honored by the time the

deed was ready, or could have had the money there by the time the deed was ready. It was just as much the duty of McAllister to have a deed ready for delivery in his outstretched hand, as for Barrett to have money ready for delivery in his outstretched hand. Both hands must be outstretched at the same time. The agreement or covenant of vendor to convey and that of the vendee to pay, unless otherwise provided in the contract, are mutual and dependent, and are to be performed contemporaneously by acts of the two concurring. In volume 2 of Lomax's Digest, 47, the law is stated thus: " In general, where, in an agreement, there is no express stipulation to the contrary, it is understood that the covenant of the purchaser to pay the price of the land is dependent on the vendor's covenant to make a good title and to convey the estate. In such a case, the obligation of the vendor on the one part, and of the purchaser on the other, are mutual and dependent. The vendor, in his action, must make his part of the agreement precedent, showing that he has a good title; and that he has, on his part, actually performed the contract, or done all that in him lay for that purpose." *Roach* v. *Dickinsons*, 9 Gratt. 154; 2 Minor, Inst. 779; *Runkle* v. *Johnson*, 30 Ill. 328, cited by Judge SNYDER in *Weaver* v. *Burr*, 31 W. Va. 777, (8. S. E. Rep. 743); *Spindle* v. *Miller*, 6 Munf. 170; *Snodgrass* v. *Wolf*, 11 W. Va. 158.

It may be said that the vendee in his action at law against the vendor for failure to perform his contract must make his part of the contract a condition precedent, as well as must the vendor in his action against the vendee for failure to perform his part of the contract, and each must aver performance of his part of the contract, or tender of performance. It seems that in formal actions at law for damages for breach of the contract such is the rule of pleading. 2 Lomax, Dig. p. 48, § 8; 3 Rob. Pr. (New) 572, 573. But as Judge TUCKER said in *Jackson* v. *Ligon*, 3 Leigh, 186, while in every case of dependent covenants time is, at law of the essence of the contract, it is in equity on general principles otherwise; and it is the boast of equity that it looks at the substance of things, regardless of forms, and relieves against forfeitures and penalties incommensurate to the injury which the party has done,

and where ample compensation can be made. Could the few days of delay in the production of the actual money injure the vendors here, especially as they were not ready to perform? Can McAllister demand in a court of equity that Barrett forfeit his rights under this proposal for mere non-payment at the day, when he and his co-owners were confessedly not ready then to perform on their part, when that court of equity is satisfied that Barrett would be able to perform by the time when the other side would be able to do so, and McAllister had solid reasons for believing that he could and would pay? Should not a court of equity treat both parties as needing a short extension, the one as well as the other, especially when the vendors held, and could continue to hold, title until full compliance on the vendee's part? Upon the question whether, in the case of unilateral contracts or options, time is of the essence of the contract, and compliance as well as acceptance on the part of the purchaser must both take place within the period, there is conflict of authority, as shown in Pomeroy on Contracts, §§ 387, 388—some decisions holding time of performance as essential in the strict sense of the term; others holding that time is merely material, not essential. In Smith's Appeal, 69 Pa. St. 474, Smith agreed to sell Raydure land, "Raydure to have the refusal ten days from date;" and it was held that "time was of the essence of the contract, as related to the option, but not as to performance." See *Bellinger* v. *Kitts*, 6 Barb. 273; *D'Arras* v. *Keyser*, 26 Pa, St. 249; *Barnard* v. *Lee*, 97 Mass. 92. See Judge SNYDER's opinion in *Weaver* v. *Burr*, 31 W. Va. 736 (8 S. E. Rep. 743). Pomeroy on Contract (section 411) says: "As already stated, time is always material, even if not essential, in a unilateral contract—*e. g.*, an agreement to give an option to purchase or to renew a lease, and the like; and a delay by the one to whom the offer is made, although not great, will be closely examined by the court, and, if not fully explained and excused, will prevent such party from enforcing the stipulation."

This admits that there may be an excuse for non-payment within the time. Even where the option makes payment within a period the act or evidence of acceptance, and strict as would be the rule against the vendee where the vendor

was capable of executing the contract, yet certainly when the fact is undeniable, as it is in the present case, that the vendors could not perform within the period by the delivery of a deed, that fact is an excuse for non-payment or non-tender by the vendee. Why go through the form of tender when that tender could not be lawfully accepted? If *Weaver v. Burr*, 31 W. Va. 736 (8 S. E. Rep. 743) is to be construed as holding that tender within the period stipulated is indispensable to the life of the contract in the case of mutual and dependent covenants on the one side to pay purchase-money, and on the other side to convey land, notwithstanding the vendor is not ready to deliver his deed, and is unable to do so within the period, we think it goes too far, and does not propound sound law. Clause 3, § 5, of syllabus. If that case is to be construed as holding that in such a case the person who has accepted the proposal, and given notice thereof, can not demand a deed to invest him with title, but must pay or tender the purchase-money, regardless of his right to such deed; and on failure of such tender or payment the option is at an end, we do not concur in that feature of that case. But certainly, if a court of equity sees that the action of the vendor is inspired by a desire and purpose, for the sake of a better bargain, to defeat the execution of the contract by the course adopted by him, the case is stronger against him. Was a greater price from other parties the moving motive which induced McAllister to do the unusual and unreasonable thing of refusing to take checks and forward them for collection, and after their collection pass the deed? Nine tenths of the business of the country is done by checks. Men do not usually carry thousands of dollars on trips into a wild country. He did not demand money from Hile, but took from him $1,000.00 in a draft on New York on the sale to him.

Barrett swears: "On the evening of June 7th I went up stairs to my room. I had a pair of moccasins on, my room being in front of Walker's, McAllister's and Hile's room. I saw Hile and McAllister standing close together, their faces almost touching, talking in a whisper, and as I entered the room they immediately stopped, and walked down stairs. On the morning of the 8th, after McAllister

had insisted on our staying another day on the land, and then refused to go with us upon it, Hile, Walker and myself and a guide started alone, Walker in advance, I following, and Hile behind me. After Walker and I got over the fence, Hile went back, and stayed with McAllister about twenty or thirty minutes. It then struck me that something was wrong, and I did not want to deal with Hile, and left him out of the transaction." Barrett says that, before seeing Hile and McAllister talking together, he had told Hile the land would cost him $3.00 per acre, and had told McAllister to tell Walker and Hile that the land would cost him (Barret) that. Hile says that on June 9th he employed an attorney to investigate title to the land. After McAllister, at Huntersville, had refused checks, and demanded money, Barrett and Walker started together for Warm Springs, and reached there the same day; and later on the same day McAllister, Hile, and Tardy started together for the same place, but stopped over night at Mountain Grove.

Hile says, in his cross-examination by Barrett: "There was no contract signed that night. There was a contract draughted that night at Mr. Dickey's house, at Mountain Grove, which provided I was to have the land, if Barrett did not come up to time. This was Thursday, June 9th. There was no price fixed. There was another contract. I was to go so and so, in case Barrett did not come to time." He also says: "There was no arrangement made at Mountain Grove for the purchase of this land of McAllister. If Barrett did not take it, McAllister said he would negotiate with me, but would not do so until he would see if Barrett would come to time. No price was fixed there for the land. I told McAllister that I had to leave the next day, and was going home the next week, and to do so I had to make the train at Millboro at 3 o'clock that day. I had nothing to do with the drawing of that paper that was drawn there. I went to bed that night, the 9th, and McAllister drew up the contract, and I did not see him draw the contract, but suppose he drew it. I told McAllister we would have but a limited time the next day at Warm Springs. This was the only object that I know of in his drawing the contract that night—to save time. The next day we entered into the

contract, and fixed the price, and I came home. I paid him down $1,000.00 by draft on New York."

In a re-cross-examination he says: " That night at Mountain Grove, I wanted to make the train, and wanted to have the outlines of the contract so I could get away, and we talked the matter over, and I went away to bed. McAllister drew the paper. I can't say whether the same party filled in the blanks in the contract next day. I can't say whether it was the same contract drawn the day before at Mountain Grove."

The next morning, June 10th, McAllister sent for Barrett to come to his office, and then said to him that he had received the written notice left at his residence, and that he supposed if he had the money the day before he still had it, and he was ready to receive it, and would not touch a dollar of it until the deed was ready, and he could place it in the hands of any one; but Barrett paid or tendered no money, but offered to pay in checks, demanded a deed, and stated that he would be ready to pay when the deed was ready, and delivered McAllister the following writing:

"I say to W. M. McAllister that I will pay him $3,125.00 in currency at any time that the deed is made. I am here at Warm Springs, ready to pay the money whenever the deed is made. I further say that, if Mr. McAllister has any doubts about the money being ready, he can telegraph to the county National Bank of Clearfield, Pa., and see if the money is in bank, and whether it will be paid on check or not. I was here at Warm Springs on the 9th of June, 1887, and served notice on McAllister to that effect. Frank Barrett."

McAllister called attention of bystanders to the fact that Barrett had no money, and said to Hile, who was on the office porch, as Barrett swears: "Come on and we will finish up our agreement." But McAllister denies this, and says that he said to Hile: "Now, Mr. Hile, I am ready to talk with you;" which shows that he had had a previous talk; and he sold the land to Hile at $2.25 per acre that same day. What other conclusion can we reach than that McAllister formed the opinion, or had the knowledge, that he could sell to Hile for a greater price than Barrett was to give, and that

Hile learned he could buy of McAllister lower than he could of Barrett, and that McAllister was quick to exact prompt tender of actual money, and, on failure of tender, to declare the option at an end, and sell to Hile, thus realizing $2,500.00 more than he would by consummating the contract with Barrett? A court of equity ill performs its function, under these circumstances, to turn Barrett from its door.

Another point made by appellant is that the contract is so indefinite in the description of the land as to be incapable of specific performance. The letter of proposal does not describe the land further than as "2,500 acres of timbered land in Pocahontas county," evidently referring to a previous negotiation. This letter called for timbered land, and it does not appear that McAllister and his co-owners owned any other timbered land. And, again, the agreement by which McAllister and his co-owners sold the land to Hile defines the land, and the bill charges that it is the same land which McAllister and his co-owners sold to Barrett, and the answer does not deny it, and Hile says: "The lands we bought were the same lands we were looking over and examining." Barrett's evidence is that by a verbal contract in April, 1887, McAllister described the 2,500 acres as lying on Gauley mountain and head-waters of Gauley and Elk rivers, and that they went over the land, and McAllister pointed out the land he was selling as lots designated on said plat as lots numbered 8, 9, 10, and 11, containing 440, 415, 530, and 547 acres, respectively, and a sufficient quantity of lots 6 and 7 to make in the aggregate 2,500, by running a line from the most southerly corner of lot 6 to the eastern side of lot 7. Walker says the land in question on the plat was lots 8, 9, 10, and 11, and parts of 6 and 7; and that McAllister, while they were at Gibson's engaged in inspecting the land, laid this plat down on the porch, and pointed out these lots, and marked them. Hile says he saw the plat spread on the porch, at Gibson's several times, but can't say whether the land was pointed out or not, and that they had it and inspected it on the land. So do the guides say. Hile says he has no recollection of lots 2 and 5 being mentioned, but that McAllister was to sell lots 8, 9, 10, and 11, and enough of lots 6 and 7, to make 2,500 acres. Gibson says

that he was asked, while McAllister, Barrett and others were present, to show the four back lots, and on the ground told them that a line cutting off the timber land would run through lots 6 and 7 and a corner of 4. A plat showing the subdivision of the 4,711 acres into lots numbered was present, and used in the whole transaction of this inspection of the land, beyond question. That plat made the land certain, except the line taking off lots 6 and 7 enough to make, with the other lots, 2,500 acres, which could be done by protraction. McAllister admits that lots 8, 9, 10 and 11, as defined on the plat, were to go in, and says the balance was to come from lots 6, 7, 2, and 5, but denies that any such line through 6 and 7 as Barrett specifies was agreed upon. Barrett and Walker say that McAllister proposed that parts of lots 2 and 5 go in, but that Barrett declined, as they did not contain good timber. Now, as to the question of the legal certainty of the contract, the statement of the bill is that the letter offered to sell "2,500 acres of timbered land in Pocahontas county." So far we have a writing to prove the offer, but just what land and its boundaries the letter does not say, but the bill further avers that the further agreement was that the land was represented on a plat, and that it was composed of lots as thereon numbered 8, 9, 10, and 11, containing 440, 415, 530, and 547 acres, respectively, and so much of lots Nos. 6 and 7 as laid down on said plat as would make the aggregate 2,500 acres, "by running a line from the most southerly corner of lot No. 6 to the eastern side of lot No. 7, taking that part of lots 6 and 7 lying on the west of said line." This is sufficient, so far as mere certainty or definiteness of description of the land is concerned. The lots are defined on the plat. Some are specified, and, as to running the line through lots 6 and 7, that could be done by survey, or even by a surveying instrument. It could be made certain, and in law therefore is certain. *Id certum est quod certum reddi potest.* It only remained to prove the matter so set forth in the bill. With proof of these allegations the plaintiff would have proven a contract legally certain, outside the statute of frauds; and therefore we pass from the question of the certainty of the contract, with the remark that there was evidence, as stated above, to prove such a contract.

We turn, then, to the statute of frauds. It is not in any manner relied upon in either answer, but is relied on in argument here; thereby asserting that oral evidence can not be admitted to supplement the letter to prove a description of the land, however certain that description may be made by such evidence. There are respectable authorities to show that oral evidence may be heard, where there is a writing to attest the fact of sale, to apply that writing to the subject-matter contemplated by it; in other words, to prove what land was referred to in it, and thus identify it. *Colerick* v. *Hooper*, 3 Ind. 316; *Waring* v. *Ayres*, 40 N. Y. 357; *Hurley* v. *Brown*, 98 Mass. 545; *Scanlan* v. *Gedded*, 112 Mass. 15; *Fowler* v. *Redican*, 52 Ill. 405; *Prater* v. *Miller*, 3 Hawks, 628; *Fish* v. *Hubbard*, 21 Wend. 651.

In *Preston* v. *Preston*, 95 U. S. 200, Mr. Justice FIELD says that it is a familiar rule that a contract which a court of equity will specifically enforce must be certain, and "the certainty required has reference both to the description of the property and the estate to be conveyed. Uncertainty as to either, not capable of being removed by extrinsic evidence, is fatal to any suit for a specific performance."

In *Creigh* v. *Boggs*, 19 W. Va. 240, a mistake was made, not in reducing the contract to writing, but in the supposition that the boundary would include a mill-site, and upon the discovery that it did not include it the parties agreed verbally to so change the boundary as to include it, and a plat was made by a surveyor of the boundary including the mill-site, and the defendant admitting the mistake and its correction orally, yet raised the statute of frauds against a bill filed by the purchaser to enforce the contract with the verbal alteration; and this Court held that specific performance should be decreed.

In *Mathews* v. *Jarrett*, 20 W. Va. 415, in delivering the opinion, Judge SNYDER says: "Extrinsic evidence, however, is only admissible to a very limited extent, and for purposes well defined and limited. It can not be used to supply any defect or omission in the terms of the written contract. It is strictly confined, in cases where no fraud, mistake, or other equitable incident of a similar character is alleged, to the function of explanation, and of exhibiting the surround-

ing circumstances, in the same manner, and only to the same extent, that such evidence is permissible in the interpretation of all other written instruments."

See cases there cited. See, also, *Woollam* v *Hearn*, 2 Lead. Cas. Eq. 1029. Though the fact of a sale is proven by a writing, I am not disposed to go very far in admitting oral evidence to define the land sold, where the writing does not define it; and, had the statute of frauds been pointedly pleaded, I would think this evidence not admissible. The answer does not set up the statute of frauds as a defence. It does not say there was no such contract as that pleaded in the bill, but, on the contrary, it admits the letter, and says that, while inspecting the land under the offer contained in this letter, McAllister said to Barrett "that any sale he would make would have to embrace lots Nos. 8, 9, 10, and 11, but no part of lots 6 and 7 was specially designated, and no line through them agreed upon;" thus admitting the oral agreement identifying the land, except as to the line through lots 6 and 7. The whole body of the agreement, except in this respect, is admitted. It is argued here that the answer is such a denial as requires the plaintiff to prove a contract valid under the statute—that is, by writing—without the answer's raising that defence; and we are cited to *Kay* v. *Curd*, 6 B. Mon. 100; *Bank* v. *Root*, 3 Paige, 478; *Wynn* v. *Garland*, 19 Ark. 23; *Small* v. *Owings*, 1 Md. Ch. 363; and other cases. An examination of these cases shows that in most of them the answer wholly denied any contract as alleged in the bill. *Kay* v. *Curd* is a case where the statute was pleaded. Others were cases where there was a material and essential difference between the contract alleged in the bill and that admitted in the answer. Where such is the case, the case is as though the answer had wholly denied the making of the contract. It must be a difference essentially affecting the contract. *Harris* v. *Knickerbacker*, 5 Wend. 638. Here, then, is, to repeat, an admission of an agreement to sell wholly four lots, and parts of 6 and 7, and only the particular line through these two lots is controverted. It is settled law that if the defendant admits the agreement, but relies on the statute as a defence in his pleadings, he can protect himself from a decree of specific performance, not-

withstanding his admission of the agreement; but if he admits the agreement, but neither pleads the statute, nor relies on it in his answer, he is deemed to have renounced the benefit of it.   Where the bill alleges an oral agreement, and the answer denies it generally, it can not be proven by oral evidence.   Browne, St. Frauds, §§ 508, 510, 510*a; Woollam* v. *Hearn,* 2 Lead. Cas. Eq. 979; 2 Minor, Inst. 775.  Treating the answer as a substantial admission of the agreement as laid in the bill, and the statute not having been pleaded or relied on in the answer, the statute of frauds is not a defence. *Fleming* v. *Holt,* 12 W. Va. 143.

Another consideration not without weight, touching the matter of certainty of description, is this, that the bill prays relief in the alternative, that is, either for a conveyance of the land, or, if that could not be had, that the court would decree that the sale made by McAllister and the Tardys to Hile and Bloom was for his use and benefit, and that he be decreed $2,500.00, the excess of purchase-money which Hile and Bloom paid over what Barrett was to pay, and so the court decreed.   This is entirely consistent with equity practice.   On the execution of a contract of sale of real estate, the vendor becomes trustee for vendee, and, if he sells subsequently to a third person, the proceeds will be affected with the trust, and the vendee is entitled to require that they shall be paid over to him in lieu of the estate which had been placed beyond his reach.   Such relief is based on the well-settled and reasonable rule that one person whose property is wrongfully converted into money may waive the tort, and will then be as much bound by and entitled under the contract as if made with his consent.   *Seton* v. *Slade,* 2 Lead. Cas. Eq. 1154; and on page 477 of 25 W. Va., in opinion in *Ballard* v. *Ballard;* 2 Pom. Eq. Jur. § 591.   It is clear that when Hile and Bloom purchased of McAllister and Tardys, Hile, who acted for himself and Bloom in purchasing, had full notice of Barrett's equity, and notice to him was notice to Bloom, as he acted as their agent.   Perry, Trusts, § 222; Bump. Fraud. Conv. 495.   Eli Bloom says he knew of Barrett's rights, and expected a law suit.

Walker is not a party.  It is complained of as an error.  A month after Barrett's acceptance, in July, 1887, he purchased of Hile a fourth interest in the land, as shown in evidence.

To meet this point, it is claimed that he is a *pendente lite* purchaser, and need not, therefore, be a party. This was absolutely so at common-law, but the common-law rule is greatly changed by section 13, c. 139, Code, 1887, requiring notice of *lis pendens* to be recorded. *Arnold* v. *Casner*, 22 W. Va. 444; *Zane* v. *Fink*, 18 W. Va., 693; *Lynch* v. *Andrews*, 25 W. Va. 751, 756. If relief by way of sale is sought, and such relief was given here, he is a necessary party. His notice of Barrett's equity, however well established, would not give him notice of the suit; and the decree selling the land would not bind him, nor estop him from setting up his interest, however much that notice of Barret's equity might affect his title in a suit brought against him to subject it to that right. If relief were by way of specific performance by conveyance of the land, if the plaintiff chose to risk it, I think he might take a decree without Walker's presence. There is no showing that Walker had notice of this suit, or that a notice of *lis pendens* had been recorded when he purchased. There was a decree to sell the land in which Walker owned a fourth interest, and this was error, he not being a party. *Donahue* v. *Fackler*, 21 W. Va. 124. He must, by proper pleading, be made a party when the cause goes back to the Circuit Court. Again, a personal decree was entered against McAllister, the Tardys, Hile, and the Bloom, although the said Hile and Bloom were proceeded against as non-residents. This was error. *O'Brien* v. *Stephens*, 11 Gratt. 610; *Mahany* v. *Kephart*, 15 W. Va. 609. Again, it was error to render a personal decree against Hile and Bloom for money. That decree should have been against McAllister and the two Tardys. While equity may follow the land into the hands of Hile and Bloom, because they were purchasers with notice of Barrett's right, yet there was no such relation between Barrett and the said Hile and Bloom as to warrant a money decree against them.

The decree is reversed, with costs to appellants, and the cause is remanded for further proceedings, as indicated in this opinion, and, further, according to the principles and practice governing courts of equity.

REVERSED. REMANDED.